

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-77,030

**MATTHEW LEE JOHNSON, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. F12-23749-W
### IN THE 363RD JUDICIAL DISTRICT COURT
### DALLAS COUNTY

HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., JOHNSON, KEASLER, ALCALA, RICHARDSON, YEARY and NEWELL, JJ., joined. MEYERS, J., did not participate.

### O P I N I O N

In October 2013, a jury convicted appellant of capital murder for intentionally causing the death of Nancy Harris, a seventy-six-year-old convenience store clerk, by setting her on fire while he was robbing or attempting to rob her.[1] *See* TEX. PENAL CODE

---

[1] In relevant part, the State alleged that, in Dallas County, Texas, on or about May 20, 2012, appellant:

(continued...)

§ 19.03(a)(2). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant to death. TEX. CODE CRIM. PROC. Art. 37.071, § 2(g).[2] Direct appeal to this Court is automatic. Art. 37.071, § 2(h). Appellant raises sixty-five points of error. After reviewing appellant's points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

FACTUAL BACKGROUND

Harris was a longtime employee of a Fina Whip-In convenience store located in Garland. On Sunday, May 20, 2012, Harris opened the store at 7:00 a.m. Videotape from the store's surveillance cameras showed appellant entering the store a few minutes later, carrying a cigarette lighter and a bottle containing what was later determined to be lighter fluid.

Appellant walked around the sales counter into the employees-only area where Harris was standing. He poured the fluid over Harris's head, demanded money, and stood immediately behind her as she attempted to open the cash register. While Harris

[1](...continued)
did unlawfully then and there intentionally cause the death of NANCY HARRIS . . . by SETTING [HARRIS] ON FIRE, AND DID USE AND EXHIBIT A DEADLY WEAPON, TO-WIT: FIRE AND AN ACCELERANT, and [appellant] was then and there in the course of committing and attempting to commit the offense of ROBBERY of [Harris].

[2] Unless otherwise indicated, all future references to Articles refer to the Code of Criminal Procedure.

struggled with the register, appellant took two cigarette lighters from a display on the sales counter and two packages of cigarettes from an overhead dispenser. He also attempted to remove Harris's ring. When it did not come off, appellant licked his fingers, used the moisture to lubricate the ring and Harris's finger, and worked the ring off.

When Harris opened the register, appellant moved in front of her, put the cash tray on the counter, and took all of the cash and some of the coins.[3] Seconds later, outside of camera range, something on the employee-side of the register burst into flames. The videotape's next frames showed Harris, on fire from her shoulders upward, running from behind the sales counter to a nearby sink. Meanwhile, appellant calmly walked out of the store. On his way, he stopped at a display rack near the front door, selected some candy, and put it in his pockets.

Harris leaned over the sink, attempting to extinguish the flames. When that attempt failed, Harris removed her burning shirt and dropped it on the floor, but her brassiere remained on fire. As Harris leaned over the sink again, flames from the still-burning shirt ignited her pants leg. She was unable to extinguish the flames. Still on fire, she made her way out of the store and began screaming for help.

Police officer Billy Coffey testified that he and another officer, Anthony Simon, were near the Whip-In at the time of the offense. When they saw flames and movement inside the store, they rushed to investigate. They reached the Whip-In's parking lot just

---

[3] The Whip-In's manager testified that the cash register would have contained approximately eighty dollars in bills and coins when Harris opened the store.

as Harris, who was on fire, stepped out of the store's front door. Coffey put out the flames by spraying Harris with a fire extinguisher. Coffey testified that Harris told Officer Simon that a man had robbed her and poured something on her. She described the perpetrator to Simon as a heavy-set black male who was wearing blue jeans and a t-shirt.[4]

William Crews, a Garland Fire Department firefighter and paramedic, testified that he treated Harris at the scene after a police officer flagged down his ambulance. He observed first, second, and third degree burns on Harris's face, shoulders, abdomen, upper arms, and legs. She was in a lot of pain, "very worried," and repeating, "Help me, help me, help me," and "Help me, help me, please."

Crews stated that Harris was able to give her name and medical history. She remained conscious and able to speak during the trip to the hospital, although her airway began to close due to swelling from the burns.

Harris was alert but still in a great deal of pain and emotional distress when she arrived at Parkland Hospital's emergency department. Because of her rapidly closing airway, emergency room staff quickly intubated Harris and placed her on a ventilator. Before she was intubated, Harris told police officer Larry Wilson that a heavy-set black male with short dark hair and a chubby face had entered the store and demanded money

---

[4] In the black-and-white video captured by the store's security cameras, appellant was shown wearing dark-colored pants, a lighter-colored short-sleeved t-shirt, and black-framed glasses.

from her.  Harris said that the man had taken the money, poured an unknown substance on her, and set her on fire.

Shortly after Officers Coffey and Simon came to Harris's aid, police dispatch began receiving calls from residents of the neighborhood behind the Whip-In.  The calls concerned the activities of a man generally matching Harris's description of the person who had robbed and set her on fire.  Three of the residents, Jim Medley, Ken Marecle, and Lawrence Denson, testified at trial about their encounters with the man, whom Marecle and Denson identified as appellant.

Medley stated that the Whip-In was located about half a block away from his house, across an alley.  At approximately 7:30 a.m. on the day of the offense, Medley went outside to investigate why his dog was barking.  He saw police cars, heard sirens, found the gate to his rear driveway open, and noticed that his garbage can had been moved.  Medley, who was not a smoker, also saw an opened cigarette pack and a broken, never-lit cigarette lying in his driveway.  The cigarette pack itself was missing two cigarettes.  When Medley put the cigarettes in his garbage can, he saw an unfamiliar light-colored, short-sleeved t-shirt inside the receptacle.  About two houses away, Medley saw a shirtless black man pushing a bicycle in the opposite direction.

Marecle testified that between 7:00 and 7:30 a.m. on the day of the offense, his adult daughter saw a man on their back porch.  The man left the back porch, heading around the side and toward the front of the house.  When Marecle opened his front door

slightly to investigate, he saw appellant standing on the front porch. Appellant was wearing pants and black-rimmed glasses, but no shirt. Appellant's eyes "were really wide and big."

Appellant repeatedly said that he needed help and then tried to force his way into Marecle's house. Marecle shouldered appellant out of the doorway and into the courtyard, where the two men struggled. Appellant pushed Marecle to the ground, took Marecle's glasses, and ran away. Marecle, whose arms were skinned during the altercation, described appellant's behavior in fighting as "irrational," but stated that he did not notice the smell of alcohol on appellant.

Between 7:00 and 8:00 a.m. on the day of the offense, Denson saw appellant trying to enter the side gate to Denson's property. When Denson confronted him, appellant approached with his arms out, saying, "Man, I'm in a bad way." Denson felt wary of appellant and told him to "get his bad way out of my yard." Appellant continued to approach Denson, but fled when Denson's 28-year-old male friend walked outside. Appellant had not seemed intoxicated to Denson.

Police officers established a perimeter around the neighborhood. Roughly an hour after the offense, Officer Rafael Perez spotted appellant, who ran when he saw the officer. Perez apprehended appellant following a foot chase. Officer Coffey assisted Perez with handcuffing appellant. After being handcuffed, appellant asked them, "What took you so long[?] Y'all are getting slow." A search of appellant's pockets yielded

Harris's ring, a used cigarette lighter, two new cigarette lighters, coins, and approximately seventy-six dollars in bills.

Perez described appellant's demeanor as "real passive." It seemed to Perez that appellant "wanted to start a conversation like nothing happened or what's going on, kind of like, really nothing. Like – to him, it was [as if] nothing was going on." Perez testified that he frequently dealt with intoxicated people and that appellant had not seemed intoxicated to him.

Coffey transported appellant to jail in a squad car equipped with a video camera that recorded appellant's speech and behavior during the trip. Appellant tried to engage Coffey in conversation. He asked, "What am I being booked for, man?" When Coffey said that appellant had been arrested for attempted capital murder, appellant asked, "Attempted capital murder of who [sic]?" Appellant also asked Coffey if the officer was "a family man" and whether the officer was "Coffey or Perez."[5] When Coffey did not respond to appellant's questions, appellant stated, "I can tell you everything, man. I can tell you what you want to know." A few minutes later, appellant stated that he had been waiting for the police and that they came because appellant wanted them to.

Coffey testified that appellant did not seem intoxicated during the trip to the jail. He noted that appellant did not smell of alcohol or have slurred speech. Instead, it

---

[5] Officer Perez had earlier testified that he and Coffey were wearing name badges when they arrested appellant, but had also stated that neither officer identified himself by name to appellant. Perez testified that, if appellant knew the officers' surnames, it was because appellant had read them from the name badges.

seemed to Coffey that appellant was coming down from an adrenaline rush or was possibly fatigued as a result of running from Officer Perez.

Dr. John Hunt, a physician who treated Harris at Parkland Hospital's Burn Unit, testified that Harris had sustained burns to over forty percent of her body, with the burns to her upper body ranging from second- to fourth-degree in severity. Harris's medical team advised her family that, given Harris's age and the severity and extent of her injuries, she would not survive. Harris, who had previously executed a do-not-resuscitate order, died on May 25, 2012, after being removed from life support. Dr. Tracy Dyer, the medical examiner who performed the autopsy, testified that Harris's injuries were consistent with flame burns and concluded that her death was a homicide caused by thermal injury.

The State also presented evidence concerning the results of DNA and other forensic testing conducted on samples obtained during the investigation of Harris's death. Most of the test results tended to link appellant to the offense, when considered in conjunction with other evidence admitted at the guilt-innocence phase.

The defense did not call any witnesses at the guilt-innocence phase of trial, and the jury convicted appellant of capital murder as alleged in the indictment.

At the punishment phase, the State presented evidence of appellant's criminal history and unadjudicated bad acts in and out of prison. Appellant's criminal history included convictions for marijuana possession, evading arrest, resisting arrest, violating a

protective order, aggravated assault, and robbery. Appellant's behavior that led to these prior convictions included making threatening telephone calls, physically abusing family members, biting two police officers, threatening a police officer, and leading officers on a high-speed chase after "carjacking" a woman.

Appellant's bad acts also included setting a girlfriend's patio rug on fire when she would not let him into her apartment, stealing from an employer, threatening to grab a police officer's gun, and exposing his genitalia to a hotel maid while grabbing her hand. While in prison, appellant assaulted his cell mate (causing a laceration to the man's head that required nine staples), masturbated in the doorway of his cell while looking and grinning at a female guard, and engaged in other disrespectful behavior toward guards.

During the defense's punishment case, appellant testified about his background, his drug abuse, and the circumstances of the offense. Appellant stated that he was sexually abused and began smoking marijuana as a child. In addition to smoking marijuana, he had abused crack cocaine since his early adulthood. He had some periods of sobriety over the years, but by October 2011, he was abusing crack cocaine again, as well as methamphetamine, alcohol, and Xanax. Appellant testified that, by the time of the offense, he had grown very depressed over his inability to stay sober and the attendant loss of his job.

Appellant said that on the Saturday evening before the offense, he attended a wedding reception at his brother's home, which was located near the Whip-In. Appellant

drank enough alcohol at the reception to become inebriated.  Around midnight, a relative gave appellant $30 to help him pay for car repairs, but appellant walked to another location and used the money to buy crack.  He smoked some of his initial crack purchase and sold some of it so that he could continue to buy the drug.  By 4:00 a.m., appellant had smoked ten "rocks" of crack.  Between 4:00 and 5:00 a.m., he took a Xanax because he knew that he would have to return home soon to babysit his daughter.

Appellant testified that he walked back to his brother's house at about 6:00 a.m. He found a bottle of wine on his brother's patio and drank all of it.  After drinking the wine, he wanted to get more money and get high again on crack.  Appellant saw a plastic bottle and put lighter fluid in it, with the idea that he was "[j]ust going to take it and scare the person" by "[p]our[ing] it on her."  Appellant testified that he wanted to use the lighter fluid as "[a] scare tactic."

Equipped with a lighter and the bottle of lighter fluid, appellant walked across the street to the Whip-In.  Appellant said that his purpose was to "[j]ust get the money and leave."  He denied that he had entered the store intending to set the clerk on fire.

When appellant entered the store, he "saw a lady," whom he later learned was Harris, preparing a mop bucket.  When appellant walked behind the sales counter, Harris followed him and told him that he was not supposed to be there.  When Harris got close, appellant said, he "just poured the fluid over her head."  Harris "started trembling."  He told Harris to open the cash register, and while she was doing that, he took a lighter and

some cigarettes. Appellant acknowledged that the store's surveillance tape showed him taking Harris's ring, but he said that he did not remember doing so.

Appellant testified that Harris moved away from the register after she opened it, but moved back towards him while he was removing the money. Appellant had a lighter in his hand. He told Harris to stand back and "flipped" the lighter "once to try to scare her, but that didn't stop her." Appellant asserted that Harris then reached across him, which "spooked" him because he did not know what she was doing. Appellant said that he "flicked [the lighter] again, twice, hoping that she would move back." Although appellant denied that he was blaming Harris for catching on fire, he testified that "she did not move. She just was determined to do whatever she was going to do—she set out to do." He testified that he was close enough to Harris that, when he flicked the lighter the second time, her clothing ignited.

Appellant remembered thinking that he needed to leave and that he "had done a bad thing." He said that it did not occur to him that he could help Harris.

Appellant remembered running away and "jumping fences" in the neighborhood adjacent to the Whip-In. Appellant said that he did not recall encountering Denson. However, appellant remembered that he left his t-shirt in a trash can because the shirt was sweaty and dirty, and he acknowledged that the trash can had probably belonged to Medley. Appellant said that he also stole a bicycle from a resident's porch, rode the bicycle until the chain came off, and then left the bicycle on a side street. Appellant

acknowledged that Marecle was the man that he subsequently "tussl[ed] with." After encountering Marecle, appellant hid in some bushes and smoked a cigarette from one of the packages he had stolen. Appellant said that he started running again when he saw a police car. When he "got tired of running," appellant sat on a porch and waited for the police to come.

Appellant stated that he would not have gone to the Whip-In to rob it, but for the influence of drugs and alcohol. Appellant acknowledged that he had caused Harris's death, but asserted that he had not intended to kill or hurt her. Appellant also acknowledged that, when he was arrested, he told the police that he had used cocaine and consumed two beers, but he had not mentioned drinking a bottle of wine or taking a Xanax. Appellant testified that, at the time, the information "was irrelevant" in his mind, adding, "I was intoxicated."

Appellant's former supervisors and coworkers testified about his positive qualities as an employee. Relatives and friends testified about his background, drug abuse, and positive qualities as a father. Defense counsel also presented testimony from expert witnesses concerning drug addiction, appellant's state of mind during the offense, and the likelihood that he would constitute a future danger in prison.

In its rebuttal case, the State presented dashboard camera video of the scene that greeted the police officers who first responded to the Whip-In. The video, which was published to the jury, showed Harris standing outside the Whip-In, still on fire, as the

officers arrived in their squad cars. On the videotape, Harris could be heard screaming and pleading for help.

The State also presented testimony from a nurse who cared for Harris at Parkland Hospital's Burn Intensive Care Unit. The nurse stated that Harris was aware of her surroundings and, despite the medical team's efforts to keep her comfortable, she experienced pain. Although Harris was on a ventilator that prevented her from speaking, she was able to communicate by nodding her head and using her fingers to spell words in the air.

The nurse testified that, on May 23, 2012, Harris was in critical condition. By spelling words in the air, Harris asked whether she were going to die. When the nurse explained the various measures that the medical team was using to treat her, Harris shook her head, indicating "no." After questioning Harris, the nurse understood that Harris did not want the interventions that the doctors were providing, but instead wanted her doctors to abide by the terms of her living will. A care conference with the medical team and Harris's family resulted in a decision to discontinue treatment. Harris thereafter died as a result of her burns.

## SUFFICIENCY OF THE EVIDENCE

In point of error thirty-three, appellant alleges that the evidence was legally insufficient to prove that he committed capital murder—an intentional killing in the course of committing or attempting to commit robbery—as opposed to simple murder and

an unrelated theft. Specifically, appellant argues that the evidence was legally insufficient to prove that he possessed the specific intent to kill Harris. Appellant also asserts that the State failed to demonstrate a nexus between Harris's murder and the theft.

When reviewing the legal sufficiency of the evidence to support a conviction, we consider all of the evidence in the light most favorable to the verdict and determine whether any rational juror could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). This standard recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence. *See Adames*, 353 S.W.3d at 860. On appellate review, we therefore determine whether the necessary inferences made by the trier of fact are reasonable based on the cumulative force of all of the evidence. *See id.*

A person commits capital murder if he (1) intentionally commits murder (2) in the course of committing or attempting to commit robbery. *See* TEX. PENAL CODE § 19.03(a)(2). Intent to murder can be inferred from circumstantial evidence such as a defendant's acts, words, and the extent of the victim's injuries. *See Ex parte Weinstein*, 421 S.W.3d 656, 668–69 (Tex. Crim. App. 2014); *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). For a murder to qualify as capital murder under section 19.03(a)(2), the killer's intent to rob must be formed before or at the time of the murder. *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995). In addition, "the State

must prove a nexus between the murder and the theft, i.e., that the murder occurred in order to facilitate the taking of the property." *Moody v. State*, 827 S.W.2d 875, 892 (Tex. Crim. App. 1992).

Appellant relies solely on his own punishment-phase testimony, in which he asserted that he had not intended to kill or hurt Harris, to support his argument that the State failed to prove his intent to murder. However, because appellant's testimony was not before the jury at the guilt-innocence phase of trial, we do not consider it in our sufficiency review. *See Barfield v. State*, 63 S.W.3d 446, 450 (Tex. Crim. App. 2001); *Munoz v. State*, 853 S.W.2d 558, 560 (Tex. Crim. App. 1993).

The evidence showed that appellant entered the Whip-In, armed with a lighter and lighter fluid. He went to the employees-only area behind the sales counter, immediately poured the lighter fluid over Harris's head, and demanded money. Holding the lighter and standing inches away from Harris, appellant waited for her to open the cash register. Moments after taking money from the register and while still in close proximity to Harris, appellant flicked the lighter at least three times until her clothing ignited. While Harris burned and frantically tried to extinguish the flames, appellant calmly left the store without making any attempt to help her. Harris suffered severe thermal injuries and died as a result.

Viewed in the light most favorable to the verdict, the evidence presented at the guilt-innocence phase was legally sufficient to support a jury finding that appellant

formed the intent to commit robbery when he entered the Whip-In. The evidence of appellant's conduct and the extent of Harris's injuries was sufficient to prove beyond a reasonable doubt that appellant intended to kill Harris when he repeatedly flicked the lighter right next to her and her lighter-fluid-soaked clothing. *See Weinstein*, 421 S.W.3d at 668–69; *Patrick*, 906 S.W.2d at 487.

The evidence was also legally sufficient to establish the requisite nexus between Harris's murder and the taking of property. The evidence supported the rational inferences that appellant set Harris on fire to eliminate her as a witness to his crime, or to afford himself an opportunity to leave the scene unhindered, or both. *See Moody*, 827 S.W.2d at 892. Point of error thirty-three is overruled.

In point of error fifty, appellant argues that the evidence was insufficient to support the jury's affirmative answer to the future-dangerousness special issue. That special issue requires the jury to determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Art. 37.071, § 2(b)(1). In deciding that special issue, the jury is entitled to consider all of the evidence admitted at both the guilt and punishment phases of trial. *Devoe v. State*, 354 S.W.3d 457, 461 (Tex. Crim. App. 2011).

We review the evidence in the light most favorable to the verdict. *Williams v. State*, 273 S.W.3d 200, 213 (Tex. Crim. App. 2008); *Jackson*, 443 U.S. at 319. Assessing the evidence and all reasonable inferences from it in this light, we determine whether any

rational trier of fact could have believed beyond a reasonable doubt that there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society. *Williams*, 273 S.W.3d at 213.

The facts of the offense, appellant's criminal history and bad acts, and other evidence showing appellant's escalating pattern of violence and disrespect for the law were sufficient to support the jury's affirmative answer to the future-dangerousness special issue. *See Devoe*, 354 S.W.3d at 462; *Swain v. State*, 181 S.W.3d 359, 370 (Tex. Crim. App. 2005). Point of error fifty is overruled.

## *BATSON*[6] CHALLENGES

In points of error one through seven, appellant alleges that the trial court erred by overruling his *Batson* challenges to the State's use of peremptory strikes against the following African-American venire members: Sheppard Brown; Kimberly Houston; Percy Phillips; Shirley Wilson; Telli White; Dionne Hashaway; and Christylynn Kyles. Appellant, who is African-American, contends that the strikes were racially motivated.

In *Batson*, the United States Supreme Court held that the Equal Protection Clause forbids a prosecutor from exercising peremptory strikes based on only the race of a potential juror. *Nieto v. State*, 365 S.W.3d 673, 675 (Tex. Crim. App. 2012). The resolution of a *Batson* challenge involves a three-step process. *Blackman v. State*, 414 S.W.3d 757, 764 (Tex. Crim. App. 2013). First, the defendant must make a prima facie

---

[6] *Batson v. Kentucky*, 476 U.S. 79 (1986).

showing of racial discrimination. *Nieto*, 365 S.W.3d at 676. Second, the burden of production shifts to the prosecutor, who must articulate a race-neutral explanation for the strike. *Id*. Third, the trial court determines whether the defendant has proven purposeful discrimination by a preponderance of the evidence. *Id*.; *see Blackman*, 414 S.W.3d at 765.

The trial court's ruling in the third step must be sustained unless it is clearly erroneous. *Blackman*, 414 S.W.3d at 765. In determining whether clear error occurred, we are not limited to the arguments or considerations that the parties specifically called to the trial court's attention. *Id*. Rather, we look to the entire voir dire record. *See id*. We review the evidence in the light most favorable to the trial court's ruling. *Young v. State*, 283 S.W.3d 854, 866 (Tex. Crim. App. 2009).

*Prima Facie Case*

When appellant raised his *Batson* challenges, the prosecutor argued that defense counsel had failed to make a prima facie case of racial discrimination. The trial court did not expressly agree or disagree with the prosecutor's argument. Instead, the trial court stated that it "would prefer that the State explain their strikes." The prosecutor offered her reasons for striking the venire members at issue without objecting to the trial court's failure to rule on appellant's prima facie case. On appeal, we therefore assume that appellant satisfied his step-one obligation. *See Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008); *Chambers v. State*, 866 S.W.2d 9, 23 (Tex. Crim. App. 1993).

*Race-Neutral Explanation*

Appellant does not assert that the State failed to satisfy its step-two obligation to articulate a facially race-neutral explanation for its challenged uses of peremptory strikes. *See Nieto*, 365 S.W.3d at 676. In any event, we find no such failure, as the prosecutor's stated reasons were facially race-neutral.

Concerning venire members Brown, Phillips, White, Hashaway, and Kyles, the prosecutor noted that the second item on the juror questionnaire presented venire members with a range of statements about the death penalty. The instructions directed venire members to select the statement that best represented their feelings on the subject. The prosecutor asserted that Brown, Phillips, White, Hashaway, and Kyles had each chosen the third statement: "Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances."[7] The prosecutor explained that she had exercised peremptory strikes against everyone from the qualified pool of venire members who had selected that response, including four Caucasian venire members. *See Jasper v. State*, 61 S.W.3d 413, 422 (Tex. Crim. App. 2001) (stating that valid and neutral reasons for exercising a peremptory challenge include answers in a venire member's pre-voir dire questionnaire indicating a bias against the imposition of the death penalty).

The prosecutor stated that she had used a strike to remove venire member Houston

---

[7] The prosecutor noted that Phillips had also circled the fifth statement: "I could never, under any circumstances, return a verdict which assessed the death penalty."

because Houston was "an attorney and we don't think that attorneys are generally good on jury panels." She added that Houston "was the only attorney in the qualified group." *See Tompkins v. State*, 774 S.W.2d 195, 205 (Tex. Crim. App. 1987) (concluding that a venire member's employment was a racially neutral reason for purposes of *Batson*'s second step).

Regarding Wilson, the prosecutor reminded the trial court that the State had unsuccessfully challenged Wilson for cause on the grounds that she was unqualified to serve in a capital case. Specifically, the prosecutor had argued that Wilson's responses during the State's voir dire showed that she could never give an affirmative answer to the future-dangerousness special issue. The prosecutor acknowledged the trial court's earlier ruling, but reasserted the State's position that Wilson was not qualified to serve as a juror in appellant's case. *See Jasper*, 61 S.W.3d at 422 (recognizing that a venire member's vacillation regarding his capacity to impose the death penalty, despite his personal beliefs, is a neutral reason for exercising a peremptory challenge).

*Purposeful Discrimination*

By denying appellant's *Batson* challenges, the trial court implicitly determined that the State's facially race-neutral explanations for striking the venire members in question were genuine rather than pretextual. Although we extend great deference to the trial court's conclusion, that deference does not by definition preclude relief. *See Watkins*, 245 S.W.3d at 448 (discussing *Miller-El v. Dretke*, 545 U.S. 231 (2005)). The combined

impact of various factors may support the conclusion that racial discrimination motivated the prosecution's peremptory challenges. *See id.* at 448–49.

Relevant factors include whether: (1) the prosecution used its option to shuffle the jury panels in a manner that supported an inference of racial discrimination; (2) the prosecutor's office trying the case followed a formal policy to exclude minority-race venire members from jury service, which was known to at least one of the prosecutors at trial; (3) the prosecution exercised its peremptory challenges to eliminate a far greater proportion of minority-race venire members than non-minority-race venire members; (4) the prosecution's asserted reasons for peremptorily striking the minority-race venire members appeared to apply equally to many non-minority-race venire members whom the prosecution did not strike; and (5) the prosecution disproportionately directed questions at minority-race venire members that were expressly designed to elicit grounds for peremptory challenges, suggesting an intent to single out minority-race venire members for elimination. *See id.* In appellant's case, these factors do not render the trial court's denial of appellant's *Batson* challenges an abuse of discretion.

We may summarily dispose of the first, second, and fifth factors. Appellant does not assert that a jury shuffle occurred in his case, and our review of the record does not reveal one. Appellant does not contend that the Dallas County District Attorney's Office presently has a formal policy to exclude racial minority members from jury service. Further, the State asserts that the office's formal policy forbids such discrimination in jury

selection, requires an investigation into sustained *Batson* challenges, and authorizes discipline (including termination) against its personnel who are found to have violated the policy. Appellant does not challenge the State's characterization of its policy or its representation that the policy was in place when the parties selected the jury for his capital murder trial. Appellant does not argue that the prosecution disparately questioned minority-race venire members, and we have found no instances of disparate questioning in our review of the record.

Concerning the third factor, appellant contends that the State disproportionately used its peremptory strikes against African-American venire members and argues that the race-neutral reasons given by the State were therefore actually pretexts. Appellant's argument is not persuasive.

The record shows that forty-eight qualified venire members remained after the trial court ruled on the parties' challenges for cause or excused members of the venire for other reasons. In their juror questionnaires, thirty-one of the forty-eight venire members (or 65%) identified themselves as "White" or "Caucasian"; twelve (or 25%) identified themselves as "Black" or "African-American"; four (or 8%) identified themselves as "Hispanic"; and one venire member (or 2%) did not specify his race.[8]

The trial court proceeded in numerical order through the forty-eight qualified venire members. Each side exercised all of the fifteen peremptory strikes to which they

---

[8] All percentages are rounded up or down to the next closest integer.

were entitled by statute. *See* Art. 35.15(a). Appellant also received and exercised two additional peremptory strikes. Neither side exercised a peremptory strike in selecting the two alternate jurors.

The last peremptory challenge was exercised by the defense, against the forty-second venire member. Of the first forty-two venire members, a total of eleven were African-American. Of those eleven African-Americans, the State struck seven and the defense struck two; two others became the second and fifth members of the jury. The forty-third qualified venire member, who was African-American, became the eleventh member of the jury.[9] The forty-fourth qualified venire member, who was Caucasian, became the twelfth member of the jury.[10]

Thus, the parties altogether peremptorily challenged thirty-two venire members, and the first forty-four venire members were "in range" to be selected for the twelve spots on the jury. All twelve qualified African-American venire members fell within the range for selection. The State used seven of its fifteen strikes (or 47%) to remove 58% of the African-American venire members who were "in range." In total, three African-American individuals served on appellant's jury.

Although the State's use of strikes against African-Americans was, arguably,

---

[9] Appellant identified the venire member, Shoquidria Jenkins, as objectionable and requested an additional strike in order to eliminate her. The trial court denied the request.

[10] The forty-fifth and forty-sixth qualified venire members, both of whom were Caucasian, became the two alternate jurors.

somewhat disproportionate, it was not egregiously so. *Cf. Watkins*, 245 S.W.3d at 451–52 (stating that the State had "clearly" used a disproportionate number of its peremptory challenges where it had exercised 55% of its challenges to eliminate roughly 88% of an identifiable racial group that comprised only 22% of the venire that was in range). But without more, the number of peremptory strikes that the State used against African-American venire members is irrelevant. *See Woodward v. Epps*, 580 F.3d 318, 338–39 (5th Cir. 2009); *Medellin v. Dretke*, 371 F.3d 270, 278 (5th Cir. 2004). "For the statistical evidence to be relevant, data concerning the entire jury pool is necessary." *Medellin*, 371 F.3d at 278.

Further, 25% of the forty-eight qualified venire members were African-American. Random selection of twelve jurors from a 25% African-American venire could be expected to result in three African-American jurors. *See Watkins*, 245 S.W.3d at 451–52. Consistent with that expectation, three African-Americans served on appellant's jury. *See id.* In short, the record does not establish that the trial court's conclusion (i.e., that the State's race-neutral explanations were genuine) was clearly erroneous. *See id.* at 452.

Regarding the fourth factor, appellant contends that the prosecution's asserted reasons for striking the African-American venire members at issue applied equally to Caucasian venire members whom the prosecution did not strike. We disagree.

The prosecutor stated that she struck Brown, Phillips, White, Hashaway, and Kyles because they had chosen the third statement given under juror questionnaire item two:

"Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances."

We have reviewed the questionnaires for the Caucasian members of the qualified venire whom the State did not choose to strike. Each of these venire members selected the second statement under questionnaire item two: "I believe that the death penalty is appropriate in some murder cases, and I could return a verdict in a proper case which assessed the death penalty." Thus, the State's reason for striking Brown, Phillips, White, Hashaway, and Kyles did not apply equally to Caucasian venire members whom it chose not to strike. *See id.* at 448–49.

The prosecutor stated that she struck Houston because Houston was an attorney. Appellant now argues that the prosecutor's stated reason was a pretext because the prosecutor did not also strike Caucasian venire members Kimberly Turvan and Molli Elliston.

The stated basis for the prosecutor's strike against Houston was her occupation as a lawyer. Thus, the State's race-neutral reason for striking Houston did not apply equally to Elliston, who was married to an attorney, or to Turvan, who worked as a paralegal. In addition, any similarity between Houston's and Turvan's occupations was insufficient to compel an inference of racial discrimination, and we will not second-guess the trial court's determination regarding the prosecutor's credibility. *Cf. Davis v. Ayala*, No. 13-1428, __ U.S. __, __, slip op. at *16 (June 18, 2015) (stating that any arguable similarity

between the "by no means indistinguishable" responses of two venire members did not compel an inference of racial discrimination, especially given the trial judge's unique position from which to assess the prosecutor's credibility).

We next turn to the State's peremptory strike against Wilson. The prosecutor acknowledged that the trial court had denied the State's challenge for cause against Wilson, on the grounds that she was unqualified to serve in a capital case. But the prosecutor maintained the State's position that Wilson could never answer "yes" to the future-dangerousness special issue, no matter what evidence it presented. The prosecutor's reluctance to take a chance on Wilson's ability to answer the future-dangerousness special issue in the State's favor did not compel the trial court to find that the prosecutor struck Wilson based on race. *See id.* at __, slip op. at *22–23 (stating that, when a potential juror expressed doubts about his openness to a death verdict, the prosecution's reluctance to take a chance on the juror's ultimate willingness to consider the death penalty in accordance with state law did not compel a finding that race motivated the peremptory strike). Further, the trial court was uniquely situated to assess the prosecutor's credibility. *See id.* at __, slip op. at *16.

In short, the trial court did not abuse its discretion by denying appellant's *Batson* challenges to the State's elimination of Brown, Houston, Phillips, Wilson, White, Hashaway, and Kyles. Points of error one through seven are overruled.

CHALLENGES FOR CAUSE

In points of error eight through nineteen and twenty-eight through thirty, appellant attacks the trial court's grant of the State's challenges for cause to venire members Mary Boulos, Judith McDaniel, Terry Plank, Floyd Stanmore, Alan Avidon, John Cavner, and Douglas Green. In points of error twenty through twenty-seven, appellant alleges that the trial court erred in denying his challenges for cause to venire members Kevin Powell, Craig Matthews, Laura Carroll, Molli Elliston, Jerry Mace, Sandra Gromacki, Sarah Wagler, and Jerri Adams.

In a capital case in which it seeks the death penalty, the State may challenge a potential juror for cause on the ground that he has conscientious scruples regarding "the infliction of the punishment of death for crime." Art. 35.16(b)(1). A venire member is also challengeable for cause by either party if the member has a bias or prejudice against the defendant or the law on which the State or defendant is entitled to rely. Art. 35.16(a)(9), (c)(2); *see Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009). However, a prospective juror who can set aside his beliefs against capital punishment and honestly answer the special issues based on the law and the evidence is not challengeable for cause. *Hernandez v. State*, 390 S.W.3d 310, 317 (Tex. Crim. App. 2012); *see Witherspoon v. Illinois*, 391 U.S. 510, 522–23 (1980). A trial court may grant a challenge for cause against a prospective juror if bias or prejudice would substantially impair the juror's ability to carry out his oath and instructions in accordance with the law. *Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002); *see Wainwright v. Witt*, 469 U.S.

412, 424 (1985).

When reviewing a trial court's decision to grant or deny a challenge for cause, we look to the entire record to determine whether there is sufficient evidence to support the trial court's ruling and reverse only for a clear abuse of discretion. *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010); *Feldman*, 71 S.W.3d at 744. Because the trial judge is in the best position to evaluate a potential juror's demeanor and responses, we review a trial court's ruling on a challenge for cause with considerable deference. *Gardner*, 306 S.W.3d at 295; *see Burks v. State*, 876 S.W.2d 877, 893 (Tex. Crim. App. 1994). We accord particular deference to the trial court's decision when a prospective juror's answers concerning his ability to follow the law are vacillating, equivocating, ambiguous, unclear, or contradictory. *Gardner*, 306 S.W.3d at 295; *Moore v. State*, 999 S.W.2d 385, 400, 407 (Tex. Crim. App. 1999).

*Boulos, McDaniel, Plank, and Stanmore*

In points of error eight, eleven, fourteen, and seventeen, appellant asserts that the trial court excused Boulos, McDaniel, Plank, and Stanmore sua sponte under Article 35.19 because it erroneously found them "absolutely disqualified" to serve on a jury. The record does not support appellant's allegations.

A trial court should not on its own motion excuse a prospective juror for cause unless the juror is absolutely disqualified from serving on a jury. *See Martinez v. State*, 621 S.W.2d 797, 798 (Tex. Crim. App. 1981). An individual is absolutely disqualified

from jury service when it appears that he is subject to the second, third, or fourth cause for challenge stated in Article 35.16. But the record in appellant's case shows that the trial court did not excuse Boulos, McDaniel, Plank, and Stanmore on its own motion. Rather, the trial court excused these venire members pursuant to the State's cause-based challenges. Points of error eight, eleven, fourteen, and seventeen are overruled.

In points of error ten, thirteen, sixteen, and nineteen, appellant argues that the trial court violated the Sixth Amendment to the United States Constitution, as interpreted by the Supreme Court in *Witt,* by granting the State's challenges for cause to Boulos, McDaniel, Plank, and Stanmore. The record does not support his argument.

<u>Boulos</u>

In her juror questionnaire, Boulos expressed some support for capital punishment but also expressed reservations about sitting in judgment of another person. During Boulos's individual voir dire, the prosecutor probed her ability to sit in judgment:

> [Prosecutor:] Okay. And like I told you in the beginning, the law is not going to require – we're not going to require that you sit in judgment of an individual in this situation –
>
> [Boulos:] Yeah.
>
> [Prosecutor:] – if it's going to do violence to your conscience.
>
> [Boulos:] Yeah.
>
> [Prosecutor:] If it is something you cannot do because of personal, moral, or religious reasons; is that where you stand?
>
> [Boulos:] Yes.

[Prosecutor:] Okay. And that's exactly what you put when you were filling out the questionnaire – page 2, Question Number 4: Do you have any moral, religious, or personal beliefs that would prevent you from sitting in judgment of another human being? You put, yes, I don't feel that I have the right to judge someone's future.

[Boulos:] Uh-huh.

[Prosecutor:] Is that a yes?

[Boulos:] Yes, sorry.

[Prosecutor:] And that's how you feel as you sit here today?

[Boulos:] Yes.

Following this exchange, the prosecutor challenged the venire member for cause, arguing that Boulos had "just stated and she [had] indicated in her questionnaire" that "for personal, moral, religious reasons [sic], she does not believe that she can sit in judgment in determining another person's life or fate." Defense counsel objected, asserting that Boulos had not said that her feelings would impair her ability to answer "the questions" and follow the law. The prosecutor responded that Boulos had also "said it would do violence to her conscience, that that is how she felt." The trial court thereafter granted the State's challenge for cause and excused Boulos.

## McDaniel

In her juror-questionnaire responses, McDaniel wrote extensive comments in which she expressed strong general opposition to capital punishment and doubts about her ability to sit in judgment of another person or return a verdict that resulted in another's

execution. During the State's voir dire, McDaniel expressed a desire to fulfill her civic duty, but reiterated her opposition to the death penalty and doubts about her ability to participate in a process that could result in a death sentence. After the State explained the law surrounding the special issues, McDaniel continued to express uncertainty regarding her ability to answer those issues according to the law and evidence. The following exchange ensued:

> [Prosecutor:] I'm going to – I – "I don't think" and "maybe" and "probably" are not – are not words that lawyers are very good at accepting, and I apologize, but the record has to be very clear, so I'm going to ask it a different way. You don't think you could. I'm going to turn that around and ask you, can you guarantee both sides of this, the State and the Defense, that you could set aside your personal feelings and be a juror in this case, even if it resulted in the death sentence?
>
> [McDaniel:] No, I can't guarantee it.
>
> [Prosecutor:] Thank you.

The prosecutor then challenged McDaniel for cause based on her questionnaire answers and voir dire responses, arguing that McDaniel was unqualified to serve as a juror in appellant's case: "She said that she would not be able to make that decision or at a minimum could not guarantee us that she could set aside her personal feeling[s] and assess a sentence that may result in execution." After the trial court granted the challenge, defense counsel stated, "For the record, we'd object," but did not elaborate further. The trial court responded, "Okay," then excused McDaniel.

### Plank

In his questionnaire, Plank repeatedly wrote that he did not believe in the death penalty, at one point describing capital punishment as "state sanctioned murder." Plank did, however, circle a response asserting that he could assess a death sentence under a proper set of circumstances, despite his belief that the death penalty should never be imposed.

During the State's voir dire, Plank described himself as "pretty severely" against the death penalty. He initially stated that he did not know whether he could answer the special issues according to the law and evidence without violating his conscience and beliefs. Later, Plank said that he "[could] follow the law." But Plank qualified that assertion almost immediately by stating, "I think I could." Plank then stated that he was "real ambivalent" and did not really know whether he could do it. During the remainder of the State's voir dire, Plank continued to express doubts about his ability to follow the law concerning punishment. This exchange followed:

> [Prosecutor:] Just because you don't agree with [capital punishment], doesn't necessarily disqualify you from the jury pool. But you've got to be able to promise me today and guarantee me today that your feelings against the death penalty would not interfere with your ability to follow the law, listen to the evidence, and base your verdict only on the evidence, even if that meant that the death penalty was imposed. And you've kind of already told me that this isn't – this isn't really for you, the death penalty; is that right?
>
> [Plank:] I believe so.
>
> [Prosecutor:] This won't be the last jury summons you get, I promise. And hopefully the next one wouldn't be on a case where the death penalty was at issue. And I know it's hard to say what you could or couldn't do in the

future because you've never been put in those shoes, but I'm telling you, you don't have to be put in that position, if you can't guarantee me you could – you could do it.

[Plank:] Right. I don't think I can guarantee anything, not – not knowing, you know – not ever having been in that position before.

The prosecutor then challenged Plank for cause. She argued that Plank's questionnaire answers and voir dire responses demonstrated that he could not set aside his strong opposition to the death penalty, follow the law, and base his verdict on the evidence. This exchange between the parties and the trial court followed:

[Defense counsel]: We would like to be given a chance to inquire of this juror about his feelings.

The Court: I'll give you a chance, but –

[Prosecutor]: Then I need to continue my voir dire.

The Court: I don't think he's qualified.

[Prosecutor]: I don't believe this juror can be rehabilitated at this point, based on his answers, Your Honor.

The Court: I don't either. I'm going to grant the challenge.

(Challenge granted.)

[Defense counsel]: Well, we'd object.

The Court: I understand.

[Defense counsel]: And object to not being able to rehabilitate him.

The Court: All right. Bring him in.

The trial court thereafter excused Plank.

Stanmore

In his questionnaire, Stanmore circled a response indicating that he believed the death penalty was appropriate in some murder cases and that he "could return a verdict in a proper case which assessed the death penalty." Elsewhere, however, Stanmore wrote that he was "not sure that [he] could vote for the death penalty." He also expressed his belief that the death penalty was unfairly applied to minorities in Texas and Dallas County and that the criminal justice system in general did not always treat minorities fairly.

During the State's voir dire, Stanmore agreed that he had reservations about the death penalty. He stated that he did not completely believe that all defendants receive a fair trial, which caused him to wonder how many innocent people had been executed. When the prosecutor asked whether Stanmore's reservations would allow him to participate in the punishment phase of a capital murder trial, Stanmore responded that he "[couldn't] a hundred percent say that [he] would be able to sit through the process." After further questioning, the following exchange occurred:

> [Prosecutor:] But I'm going to narrow it down for you. But in this particular case, because you were familiar with it and you said you do have reservations about this particular case, is it a true statement that this probably wouldn't be the best jury or you should not be able to sit on this – this particular case with the reservations that you have?
>
> [Stanmore:] I would say that's possible, yes. That that might – this may not be the case for me.
>
> [Prosecutor:] Now, you're saying possibly. I will tell you as a lawyer, we

don't go with possibly.

[Stanmore:]  I understand.

[Prosecutor:]  We [have] to go with yeses and nos.

[Stanmore:]  Right.  Exactly.  I understand that.  But if I sit here and say, yes, I can definitely –

[Prosecutor:]  Participate in the process?

[Stanmore:]  – participate in the process, and if it – if the evidence warrants or the conclusion is that there's a conviction and the death penalty is the – is the punishment, I can't say, yes, I would vote for it.  I can't say yes for sure.

The prosecutor subsequently emphasized the State's belief that it would prove appellant guilty of capital murder beyond a reasonable doubt, and that the case would proceed to the punishment phase.  The prosecutor explained that the punishment phase would not involve a simple vote for life or death, but instead would require the jury to answer a future-dangerousness special issue.  She additionally explained that, if the jury answered the future-dangerousness special issue in the affirmative, then it would be required to answer a mitigation special issue.  The prosecutor stressed the State's belief that it would present the quality and quantity of evidence at punishment such that, if the jury answered the special issues according to the law and evidence, a death verdict would result and the sentence would eventually be carried out.  She continued:

[Prosecutor:]  . . . So I tell you this because that is part of the process, Mr. Stanmore, and only you can tell us right now as you sit here if you are willing to participate in that process or if you want to participate in that process.

[Stanmore:] If you – if the answer is yes or no, I would say no. I think it would bother me. Even though the crime probably requires that, I think it would bother me as an individual.

[Prosecutor:] Okay.

[Stanmore:] Yeah.

The prosecutor thereafter challenged Stanmore for cause. After the trial court granted the challenge, defense counsel asked "to put some things on the record." This exchange followed after the Court granted defense counsel permission:

[Defense counsel:] Your Honor, the fact that this juror has reservations, that's actually okay, and that the presumption for life is part of the law. And with regard to the fact that he said he didn't want to participate, that wasn't challengeable for cause because I don't think anybody wants to participate in a death penalty case.

In addition, we object to his being excused without the opportunity to question him.

The Court: I have it down here he said he could not participate in the process. I believe that's what he said.

[Prosecutor:] And also, the last thing he said it would violate his conscience and he said it will bother him.

The Court: Yes. All right. Bring him back in.

The trial court then excused Stanmore.

The record includes sufficient evidence to support the trial court's rulings on the State's challenges to Boulos, McDaniel, Plank, and Stanmore. *See Davis*, 329 S.W.3d at 807. Further, given the unclear or vacillating nature of these venire members' responses, we afford particular deference to the trial court's ruling. *See Gardner*, 306 S.W.3d at

295; *Moore*, 999 S.W.2d at 400, 407. Points of error ten, thirteen, sixteen, and nineteen are overruled.

In points of error nine, twelve, fifteen, and eighteen, appellant asserts that the trial court violated his right to counsel under Article I, Section 10, of the Texas Constitution because it granted the State's challenges for cause lodged against Boulos, McDaniel, Plank, and Stanmore without allowing the defense an opportunity to question them. Specifically, he contends that the lack of opportunity to question these venire members impeded defense counsel's ability to use peremptory challenges.

The relevant statute provides:

> In a capital felony case in which the State seeks the death penalty, the court shall propound to the entire panel of prospective jurors questions concerning the principles, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion. Then, on demand of the State or defendant, either is entitled to examine each juror on voir dire individually and apart from the entire panel, and may further question the juror on the principles propounded by the court.

Art. 35.17, § 2. We have interpreted the statute as requiring the trial court, on the demand of either party, to allow that party to individually question a venire member on the principles that the court has already discussed. *See Simpson v. State*, 119 S.W.3d 262, 266 (Tex. Crim. App. 2003). "As a result, a trial court that denies a party's request has erred." *Id.*

Nonetheless, we have rejected "the overly broad conclusion" that "every restriction on counsel's voir dire presentation violates an accused's right to counsel." *See Easley v.*

*State*, 424 S.W.3d 535, 538 (Tex. Crim. App. 2014) (discussing our interpretation of the "right to be heard" language of Article I, Section 10). When an appellant complains that he was not afforded an opportunity to question a venire member, we review the record for harm under the non-constitutional standard provided by Rule 44.2(b) of the Texas Rules of Appellate Procedure. *See Simpson*, 119 S.W.3d at 266.

Under Rule 44.2(b), we disregard all non-constitutional errors that do not affect the appellant's substantial rights. *Id.* A substantial right is affected when the error has a substantial and injurious effect or influence in determining the jury's verdict. *Id.*

Appellant did not preserve his complaint for appellate review concerning Boulos and McDaniel because the record shows that trial counsel did not ask to question them. *See* TEX. R. APP. P. 33.1. Regarding Plank and Stanmore, we conclude that any error by the trial court in denying appellant the opportunity to question them was harmless because it did not affect appellant's substantial rights. *See Simpson*, 119 S.W.3d at 266. Given Plank's and Stanmore's questionnaires and responses when questioned by the State, "it is highly unlikely that the appellant would have been able to convince [them] to say otherwise or that the trial court would have abused its discretion in dismissing [them] for cause" after questioning by the defense. *See id.* at 266–67. Points of error nine, twelve, fifteen, and eighteen are overruled.

*Avidon*

Appellant asserts that the trial court abused its discretion by dismissing Avidon sua

sponte for a reason that is not listed in Article 35.16. He also asserts that the trial court denied him an opportunity to question Avidon. Because appellant's claim is based on more than one legal theory, his entire point of error is multifarious. *See Davis*, 329 S.W.3d at 803. Nevertheless, we will address it in the interest of justice.

The juror questionnaire asked prospective jurors whether they had ever "been accused, arrested or convicted (including probation, deferred adjudication, conditional discharge, fine, etc.) of a crime *above* the level of a traffic ticket." Before Avidon's individual voir dire, the prosecutor advised the trial court that Avidon had checked "no" in response to that question. The prosecutor stated that Avidon's criminal-history report, however, showed that he had been arrested in 1970 for possession of a dangerous drug and had received deferred adjudication in 1980 for driving while intoxicated.

The prosecutor argued that Avidon had not been candid when he completed the questionnaire, and that his lack of candor with the tribunal rendered him challengeable for cause. Defense counsel argued that the trial court should question Avidon to ascertain whether his "no" answer was due to a lack of candor or whether it was merely an oversight.

After Avidon took the stand, the trial court directed him to the relevant questionnaire item and conveyed the results of the criminal-history report. After confirming the report's accuracy, Avidon volunteered, "I didn't indicate it on the questionnaire thinking that it was, you know so long that the statute of limitation passed."

When the trial court told Avidon that defense counsel "would like to speak to [him] for just a minute," defense counsel told the trial court, "Judge, I don't have any questions." The State renewed its challenge to Avidon "for lack of candor with the tribunal in his questionnaire." Defense counsel objected. The trial court granted the challenge.

"The State may assert grounds for a challenge that are not included in Article 35.16 where the challenge is based on facts demonstrating that the prospective juror would be incapable or unfit for jury service." *Granados v. State*, 85 S.W.3d 217, 230 n.37 (Tex. Crim. App. 2002). Challenges that are not based upon any ground specifically enumerated in Article 35.16 are "addressed to the sound discretion of the trial judge." *See Mason v. State*, 905 S.W.2d 570, 577 (Tex. Crim. App. 1995).

We find no abuse of discretion by the trial judge, who was in the best position to evaluate Avidon's demeanor and responses. *See Gardner*, 306 S.W.3d at 295. To the extent appellant alleges that the trial court denied him an opportunity to question Avidon, the record shows that the trial court gave defense counsel an opportunity to question Avidon, but defense counsel expressly declined it. Appellant accordingly waived appellate review of this aspect of his complaint. *See Grado v. State*, 445 S.W.3d 736, 739 (Tex. Crim. App. 2014). Point of error twenty-eight is overruled.

### *Cavner*

Appellant contends that the trial court abused its discretion and reversibly erred under *Wainwright v. Witt* when it granted the State's challenge for cause to Cavner. We

disagree.

Cavner's questionnaire responses reflected strong opposition to capital punishment. During Cavner's individual voir dire, the prosecutor explained the two phases of a death-penalty trial and asked whether he was inclined to always answer the special issues in such a way that a life sentence would result. Cavner replied, "I think there is – that I would be constantly trying to prove to myself that is not the right answer. In other words, that would be my – my – my leaning, my bias probably." When the prosecutor asked whether Cavner could guarantee that he would set aside his personal feelings about the death penalty and decide the punishment special issues solely on "the facts and evidence," Cavner answered, "I can't guarantee that."

When defense counsel asked him the same question, Cavner stated, "I could, but I – as I've said before, I know I'm going to have a, going in, bias[.]" Later, Cavner stated, "If I could find nothing mitigating, then I could."

At the conclusion of the defense's voir dire, the trial court questioned Cavner, apparently attempting to clarify his answers:

> The Court: All I want you to do is tell me . . . exactly how you feel and believe. Would – will you always find mitigating evidence regardless of the evidence?
>
> [Cavner]: Well, I answered [defense counsel's] question the way I did because I think it will be very difficult for there not to be mitigating evidence.
>
> The Court: Well, that's all right, too. Can there ever be – with your opinion about the death penalty and your opposition to it, again, if you want

to look at Special Issue Number 2, can you – will you ever be – regardless of the evidence, will you ever be able to answer that issue yes, knowing death – I'm sorry, no, knowing that the death penalty will result?  Whatever you say, that's it.

[Cavner]:  I don't believe I could do it.

The Court:  Well –

[Cavner]:  I can't do it.

The Court:  Any doubt in your mind?

[Cavner]:  No doubt.

The Court:  You've heard all the questions.

[Cavner]:  I have.

The Court:  You're smart.  With your – with your beliefs, I ask you one last time.  Can you ever answer Special Issue Number 2 regardless of anything you hear in any capital murder case?

[Cavner]:  I'd have to say no.

The Court:  Sir?

[Cavner]:  No.

We find no abuse of discretion by the trial judge, who was in the best position to evaluate Cavner's demeanor and responses.  *See Gardner*, 306 S.W.3d at 295.  Point of error twenty-nine is overruled.

## *Green*

Appellant argues that Green was a qualified juror, and therefore, the trial court abused its discretion and reversibly erred when it excused him pursuant to Article 35.16.

The record shows that both parties questioned Green during his individual voir dire. At the end of Green's questioning by defense counsel, the State challenged the venire member for cause. The prosecutor argued that Green's answers during voir dire showed that he would disregard the law and evidence, and instead follow his own mind. The prosecutor asserted that Green would hold the State to a higher burden of proof on some matters, but in other respects, he would not require the State to prove each and every element of its case. The prosecutor contended that Green would also require the defendant to testify and show remorse.

The record shows that Green was a vacillating juror who often gave unclear or contradictory responses on topics such as his ability to apply the appropriate burden of proof, to require the State to prove every element of its case, and to honor a defendant's right to remain silent. In such cases, we accord particular deference to the trial court's decision, and we do so here. *See Gardner*, 306 S.W.3d at 295; *Moore*, 999 S.W.2d at 400, 407. Point of error thirty is overruled.

*Powell, Matthews, Carroll, Elliston, Mace, Gromacki, Wagler, and Adams*

Appellant alleges that the trial court erred in denying his challenges for cause to Powell, Matthews, Carroll, Elliston, Mace, Gromacki, Wagler, and Adams. In each point of error associated with these venire members, appellant argues that, by denying his challenges, the trial court violated his right to a fair and unbiased jury under the United States Constitution and Article 35.16(c). Because appellant bases points of error twenty

through twenty-seven on both federal constitutional and state statutory grounds, each of those points of error is multifarious. *See Davis*, 329 S.W.3d at 803. However, in the interest of justice, we will address his allegations.

The parties made their peremptory challenges after the trial court qualified a panel of prospective jurors. Appellant exhausted his fifteen statutory peremptory strikes, using seven to eliminate Powell, Matthews, Carroll, Elliston, Mace, Gromacki, and Wagler, and the remainder on venire members who are not relevant to our analysis. After using its fifteenth strike, the defense requested, received, and exercised two additional strikes. When the defense requested a third additional strike, the trial court denied the request.

The next qualified juror, Shonquidria Jenkins, became the eleventh member of the jury. Appellant identified Jenkins as an objectionable juror and again requested an additional strike. The trial court denied the request. Adams, the next qualified venire member, was seated as the twelfth member of the jury. Appellant did not identify Adams as an objectionable juror.

Because appellant received two additional peremptory strikes, to demonstrate harm he must show that the trial court erroneously denied at least three of his challenges for cause. *See Comeaux v. State*, 445 S.W.3d 745, 749–50 (Tex. Crim. App. 2014); *Chambers*, 866 S.W.2d at 23.

Powell

Following Powell's individual voir dire, defense counsel challenged him based on

his questionnaire answers. Defense counsel argued that Powell's questionnaire responses showed that "he would give more credibility to police officers" and that "he would also automatically consider the death penalty for intentional murder." Relying on *Morgan v. Illinois*, 504 U.S. 719, 729 (1992), defense counsel argued that the trial court should disregard Powell's voir dire responses, in which he stated that he could be fair and follow the law. The trial court denied the challenge.

A venire member who would automatically vote for the death penalty is challengeable for cause once a proper basis is established. *See Morgan*, 504 U.S. at 729; *Raby v. State*, 970 S.W.2d 1, 12 (Tex. Crim. App. 1998). The same is true of a venire member who holds an "*extreme* or *absolute*" position regarding the credibility of any category of witness. *See Jones v. State*, 982 S.W.2d 386, 390 (Tex. Crim. App. 1998) (emphasis in original) (clarifying that venire members need not be completely impartial or free of any trace of skepticism toward a particular category of witness). To establish a proper basis for challenge, appellant had to show that Powell "understood the requirements of the law and could not overcome his prejudice well enough to follow the law." *Gardner*, 306 S.W.3d at 295.

Appellant failed to establish the proper basis to challenge Powell for cause. The requirements of the law are explained during voir dire and after the questionnaire or juror card is answered. *See, e.g., Cardenas v. State*, 325 S.W.3d 179, 185–86 (Tex. Crim. App. 2010); *Garza v. State*, 7 S.W.3d 164, 166 (Tex. Crim. App. 1999); *Barnard v. State*, 730

S.W.2d 703, 715 (Tex. Crim. App. 1987). Because appellant expressly relied only on Powell's questionnaire answers in challenging the venire member, it was within the trial court's discretion to determine that appellant did not satisfy his burden to show that the challenge was proper. *See Garza*, 7 S.W.3d at 166.

It was also within the trial court's discretion to determine that Powell's voir dire responses did not render him challengeable for cause. *Morgan* is not on point. *See Gonzalez v. State*, 353 S.W.3d 826, 836 n.7 (Tex. Crim. App. 2011). Throughout his voir dire, Powell repeatedly stated that his questionnaire answers reflected his personal beliefs, but steadfastly maintained that he could set those beliefs aside and follow the law. *See id.* The trial judge was entitled to believe Powell, and we defer to that belief. Point of error twenty is overruled.

<u>Matthews</u>

On his juror questionnaire, Matthews stated that he thought the death penalty should be available for "murder with intent, prethought, or [egregious] and extreme circumstances." During Matthews's individual voir dire, the prosecutor explained the difference between murder and capital murder and that only people convicted of a capital murder were eligible for the death penalty. The prosecutor also emphasized that a death sentence was not the automatic punishment for someone convicted of capital murder. She explained that jurors in a capital case did not vote for or against a death sentence, but instead answered two special issues.

Throughout the prosecutor's explanation, Matthews affirmed that he understood.

He explained that he had been "answering from [his] personal beliefs" on the

questionnaire, but would not "have a problem" following the law as long as he "could

have access to the resources." His response prompted the following exchange:

> [Prosecutor:] Absolutely. And, you know, we ask you all these things
> before the law has been explained to you, and that's why I just want to
> make sure that even though this is your personal belief that you are
> completely entitled to at all times, that you would then be able to – and
> you're not going to have to memorize this. You'll see it again in the jury's
> charge, the special issues. I just want to make sure that if the law is given
> to you by the Court, you would then be able to render your verdict based on
> the law and the evidence and not have any automatics. No automatic
> response because somebody is found guilty of the offense of capital murder
> and no matter how cold, horrible, and heinous, that you will be able to
> deliberate with regards to Special Issue Number 1 and make the State prove
> that to you beyond a reasonable doubt before answering it yes.
>
> [Matthews:] Yeah.

Later, the prosecutor gave Matthews various examples to illustrate why the law

required that there be no automatic sentence of death after a conviction of capital murder

and no automatic answers to the special issues. The prosecutor thereafter probed

Matthews's understanding of the capital sentencing process and his ability to follow it:

> [Prosecutor:] Do you understand why it's so important to wait and follow
> through the entire process, rather than having any automatic responses or
> answers?
>
> [Matthews:] Yes.
>
> [Prosecutor:] And that's all the law is asking you to do is just that you
> follow it through the entire process, through every stage, and not have any
> automatic answers or responses. And while it's completely okay to have

your personal feelings and beliefs on any and all of this, just follow the law as it's given to you because that would be your oath that you take as a juror. And are you able to do that, Mr. Matthews?

[Matthews:] Yes.

When defense counsel questioned Matthews, she asked him to assume that he was on a jury in a capital case and that the jury had just found the defendant guilty of an intentional murder in the course of a robbery. Defense counsel asked Matthews what his "feelings on the death penalty [were] at that point." Matthews responded, "I don't know. My understanding of the law as it's been presented to me is that – if those causes and consequences are proven, then – then it's an option relative to the two special issues." When defense counsel asked whether he thought that life without parole would be an appropriate punishment for someone who was guilty of capital murder, Matthews replied, "It's possible," and "I thought that's what Special Issue Number 2 was all about."

Defense counsel proceeded to ask Matthews his personal views about the purpose of the death penalty, whether Texas should have a death penalty, and whether Texas's capital sentencing scheme was "how we ought to do it." Regarding the first and last questions, Matthews stated that he did not know and that they were "hard question[s]." Concerning whether Texas should have the death penalty, Matthews stated that "if you had to force my hand and classify me, I would be a proponent of the death penalty." He added, "But I . . . feel like I would try and be as open-minded as I thought the situation bore, given the parameters of the judicial system that I'm trying to operate under."

At the end of his individual voir dire, the defense challenged Matthews for cause. Defense counsel argued that Matthews "made it clear that once he found somebody guilty of intentional murder in the course of a robbery, that he was predisposed . . . toward answering Special Issue Number 1 yes" because "in his mind . . . a person who is guilty of capital murder is also going to be a future danger." The trial court responded, "I don't think a disqualifying question was asked of him on that matter. And I think after hearing all of his testimony, I think he can follow the law and be a fair juror, so I'm going to deny your challenge."

To establish a proper basis for a challenge, appellant had to show that Matthews "understood the requirements of the law and could not overcome his prejudice well enough to follow the law." *Gardner*, 306 S.W.3d at 295. The trial court did not abuse its discretion when it determined that appellant had not established a proper basis for challenging Matthews. *See Davis*, 329 S.W.3d at 807; *Feldman*, 71 S.W.3d at 744. In addition, the trial court was in the best position to judge Matthews's credibility and demeanor, and we will not substitute our judgment for the trial court's. *See Gardner*, 306 S.W.3d at 295. Point of error twenty-one is overruled.

Carroll

During Carroll's individual voir dire, defense counsel asked her to imagine that she sat on a jury that had just convicted a defendant of capital murder. Carroll stated that she could presume that life without parole was the appropriate sentence. Carroll denied

defense counsel's suggestion that she would, at that point, "be leaning toward the death penalty." Carroll responded: "No. It would depend on the circumstances throughout the entire trial. I can't make a presumption like that without having any kind of evidence to say that, yes, I would go either way."

Defense counsel extended the hypothetical, asking Carroll to assume that she and her fellow jurors had answered the future-dangerousness special issue in the affirmative:

> [Defense counsel:] So at that point we're talking about somebody who is a pretty bad guy. They're guilty of capital murder, and they are a future danger. What are your feelings on the death penalty for that person at that point?
>
> [Carroll:] I think the death penalty would then be fitting. If they're going to be in society, even in a penitentiary where they'd possibly be able to harm others, then I think it would be fitting at that time.
>
> [Defense counsel:] Would that be all that you needed to know in order to feel that death – that the death penalty was the appropriate punishment, that they're guilty and that they're going to be a future danger?
>
> [Carroll:] You know, I don't know. I've never been in that position. I would think that –
>
> [Defense counsel:] Okay. I know and –
>
> [Carroll:] I would need more information to make that – an assumption like that.

When Carroll had defense counsel repeat the question, defense counsel reiterated the hypothetical and continued questioning her:

> [Defense counsel:] Does question – Special Issue Number 2, does that even matter at that point?

[Carroll:]  Well, it always matters.

[Defense counsel:]  If you found someone guilty of capital murder and you found somebody was going to be a threat in the future, there's not going to be anything that's going to convince you that life is the appropriate punishment at that point, is there?

[Carroll:]  There could be.

[Defense counsel:]  Okay.

[Carroll:]  I don't know what it would be, but –

[Defense counsel:]  Could you –

[Carroll:]  – you know, if the law says it's one or the other and you have to pick what's most fitting, then based on the evidence, that's the information I would need to be able to say one or the other.  I would be okay giving a life sentence.  I would be okay giving a death sentence.

[Defense counsel:]  Even for someone who is going to be a threat in the future?

[Carroll:]  I would lean more closely toward the death penalty at that time, but I would have no problem listening to others and discussing why we should go with a life sentence instead.

Defense counsel then asked Carroll whether the defense would "have to bring [her] some kind of evidence to convince [her] that life is appropriate at that point," which prompted the following exchange:

[Carroll:]  You would think that they would.  I would think that they would.

[Defense counsel:]  Would you require that?

[Carroll:]  No.

[Defense counsel:]  So you think that you could find somebody guilty of

capital murder and find they're going to be a threat in the future and still feel life is appropriate at that point?

[Carroll:]  Potentially, yeah.  If that's what our discussions warrant, yes.

[Defense counsel:]  What do you mean when you say, if that's what our discussions warrant?

[Carroll:]  Because – just because I may think a death penalty is appropriate doesn't necessarily mean that it is, so I would count on those other jurors, as well, to give me their points of view as to why life would be more appropriate, so it would be based upon those discussions as a group.

[Defense counsel:]  What would be your personal feeling?

[Carroll:]  At that point in time, I would most likely go with the death penalty.

[Defense counsel:]  After finding somebody guilty of capital murder and finding that they're going to be a threat in the future?

[Carroll:]  Yes.  The threat in the future, I think, is what would actually make me lean more toward that.

* * *

[Defense counsel:]  So you're – you're telling us that your personal feelings at that point is [sic] that you're inclined to say death is the appropriate punishment at that point, unless somebody convinces you that it's not?

[Carroll:]  Right.  Again, I don't know law, so I would have to have that information in front of me to be able to continue to read through it, to see what it says.

Defense counsel later returned to her hypothetical:

[Defense counsel:]  So you are saying that – that if you found somebody guilty and you found that they're a continuing threat, would somebody have to convince you at that point that a life sentence is more appropriate because you're already leaning toward death?

[Carroll:] I won't know until I have all the facts. Me personally right now as I sit, I would lean more toward the death penalty. However, I believe in the course of discussions in the jury [sic] that I might hear other information and other points of view that I had not considered, which might then sway me to go the other way.

[Defense counsel:] But for you personally, once you've found somebody guilty and found they're going to be a future threat, your personal feeling is that the death penalty is the appropriate punishment at that point?

[Carroll:] It would be, yes.

[Defense counsel:] Unless somebody can convince you otherwise?

[Carroll]: I [sic] would be, yes.

At the end of Carroll's individual voir dire, defense counsel challenged her "on the basis that we believe she is mitigation impaired" and had "a bias." Defense counsel argued that Carroll had said that "once she found somebody guilty of capital murder and found they were going to be a future danger, at that point she's leaning toward a death penalty and someone would have to convince her that life was a more appropriate verdict." The trial court denied the challenge.

The trial court did not abuse its discretion. Carroll was subject to a challenge for cause by the defense if she harbored a bias against the law upon which the defense was entitled to rely. *See* Art. 35.16(c)(2). The trial court was within its discretion to determine that, even if Carroll held the bias that defense counsel alleged, it was not "against [a] law upon which the defense was entitled to rely." *See id.*

Because there is no law placing the burden of proof on the State concerning the

mitigation special issue, a venire member is not challengeable for cause simply because she would place the burden of proof on mitigation on the defense. *See Saldano v. State*, 232 S.W.3d 77, 92 (Tex. Crim. App. 2007); *Ladd v. State*, 3 S.W.3d 547, 559 (Tex. Crim. App. 1999). Further, we have rejected the argument that there is a legal presumption in favor of a life sentence even if a jury answers "Yes" to the future-dangerousness special issue. *See Gardner*, 306 S.W.3d at 303 (describing the alleged presumption as "non-existent" and "non-statutory"). Once the jury has made an affirmative finding concerning future dangerousness, a defendant's sentence is presumptively death unless, after considering the mitigating evidence presented to it, the jury also answers the mitigation special issue in the affirmative or deadlocks on that issue. *See* Art. 37.071, § 2(g); *Perry v. State*, 158 S.W.3d 438, 447 (Tex. Crim. App. 2004).

Further, the totality of Carroll's voir dire supports the conclusion that she would maintain an open mind and base her answer to the mitigation special issue on the law and evidence, and would not require the defense to present any evidence. Point of error twenty-two is overruled.

Elliston

On appeal, appellant argues that Elliston was challengeable for cause under Article 35.16(c)(2) because she had a bias against the law on which he was entitled to rely. Specifically, he contends that she "would require only a single criminal act of violence"

to determine that a defendant would be a future danger.[11]

During Elliston's individual voir dire, the prosecutor explained the law concerning the future-dangerousness special issue. Elliston stated that she could answer the question based on the law and evidence.

When defense counsel questioned Elliston about the future-dangerousness special issue, defense counsel noted that it referred to "criminal acts of violence," which led to this exchange:

> [Defense counsel:] Okay. So before you can answer Special Issue Number 1 yes, you would have to believe that the individual would commit criminal acts, plural, of violence. Do you agree with that in reading –
>
> [Elliston:] That's interesting. I'm not sure if they would commit – if you're the one who's the recipient of their – of at least one criminal act of violence, I'm not sure I would – I'd have to think about that, if that truly means acts plural and not a singular act.
>
> [Defense counsel:] Well, would you agree with me it's in the plural, right?
>
> [Elliston:] It is. It is. I don't disagree with that.
>
> [Defense counsel:] So that is what the legislature intended.
>
> [Elliston:] Yeah.
>
> [Defense counsel:] So you're telling me – and you – you answer the answer [sic] the question for me. If it's just one act versus acts plural, does that

---

[11] To the extent that, on appeal, appellant alleges that Elliston was also challengeable under Article 35.16(a)(9) because she had a bias against him or because she would automatically vote for the death penalty if he were convicted of capital murder, his arguments render his entire point of error multifarious. *See Davis*, 329 S.W.3d at 803. In addition, appellant failed to object on either of these bases at trial and therefore failed to preserve these aspects of his complaint for appellate review. *See* TEX. R. APP. P. 33.1.

make a difference to you?

[Elliston:]  Possibly, honestly.

[Defense counsel:]  Okay.  And that's all we ask is for your –

[Elliston:]  I mean, if you're – if you're the recipient of that single act of violence, then, but if they're – if they're – have a propensity to – of a future criminal act, how could you ever know whether it was just one or more.  If they can, they can.  If you don't think they will, then they won't, so how could you ever split hairs and say, oh, well, they could have a future of – they could have a propensity toward just one criminal act, but – but not multiple.  I mean, they either can or they can't, it seems like to me.  That seems a little bit like splitting hairs [as] to whether it would be just one or multiple.

When defense counsel observed that the Legislature nevertheless seemed to have

drawn the distinction, Elliston replied that she would "have to think about that."  Her

exchange with defense counsel continued:

[Elliston:]  I'm thinking.  Criminal acts of violence – If – I – if you think a person is – is likely to commit another act of violence which would constitute a threat to society, then I'm having trouble distinguishing if it's – if you have – if anybody can be so specific as saying, one – they can do one future act of violence but not five.  I don't know how – I don't know how you ever – I'm not sure they did intend that.  I think it's maybe – I don't know.  I don't know.  If I – if I thought – if that act of violence is to kill somebody else, that's a continuing threat to society.  One person being killed is a threat, whether it's a prison –

[Defense counsel:]  So if – if I'm interpreting –

[Elliston:]  Yeah, I'd have a hard time.

Defense counsel rephrased the question:

[Defense counsel:]  And hopefully we can – we can figure this out.  Are you saying that if you thought there's a probability that the Defendant would

commit a criminal act, singular, that would be sufficient for you to answer Special Issue Number 1 yes, as opposed to criminal acts, plural?

[Elliston:] Yeah, I think so. I think when you've already got a strike against you and if you – if some – I just don't – you're – you're – you're speculating anyway at best whether or not they will commit future acts. It's – no one really knows that. So I do not see how you can break it down and say I think they'll possibly commit one other act, but that would certainly be their limit. I just don't think you can do that. If that's what the legislature intended, I'm a believer in following the law, regardless of my beliefs, but I just got to – I don't – I'd love to –

Defense counsel interrupted Elliston and asked whether she understood that, once a jury found a person guilty of capital murder, the law presumed that the proper punishment verdict was life imprisonment without parole and that the State had the burden of proof beyond a reasonable doubt on the future-dangerousness special issue. Elliston said that she understood. Questioning continued:

[Defense counsel:] Okay. And if their proof was criminal acts, made you believe criminal acts – act, singular, as opposed to criminal acts, plural – criminal acts [sic] singular would be sufficient for you to find – to say yes to Special Issue Number 1?

[Elliston:] If – if they could prove beyond a reasonable doubt that they would create a – that they would commit a criminal act – are you saying that's – is that the question?

[Defense counsel:] Yes.

[Elliston:] Then that would satisfy me, yeah.

At the end of Elliston's voir dire, defense counsel challenged her for cause, arguing that the venire member had stated that she would "only require a criminal act before she would – a single criminal act before she would answer Special Issue Number 1

yes. And the legislature clearly said criminal acts, plural. And that's the basis of this our challenge." The trial court denied the challenge.

The trial court did not abuse its discretion, as its determination was within the zone of reasonable disagreement. We have interpreted the future-dangerousness special issue as "essentially a normative [question] as the Legislature declined to specify a particular level of risk or probability of violence." *See Coble v. State*, 330 S.W.3d 253, 267–68 (Tex. Crim. App. 2010); *see also Estrada v. State*, 313 S.W.3d 274, 281–82 (Tex. Crim. App. 2010) (discussing our "commonsense" or "core" interpretation of the future-dangerousness inquiry). We have emphasized that the future-dangerousness special issue focuses on the degree to which a defendant "poses a real threat of future violence." *See Coble*, 330 S.W.3d at 268. Defense counsel's semantic wrangling with Elliston did not compel the trial court to find that the venire member had a bias against the law that she was unable to set aside. Point of error twenty-three is overruled.

<u>Mace</u>

On his questionnaire, Mace expressed strong support for the death penalty, writing "I believe that anyone who knowingly takes another life does not deserve to breathe air." He wrote that the death penalty should be available for "murder (premeditated)" and that "[t]he act itself and was it a planned murder" would be important to him in deciding whether a person received a death sentence rather than a life sentence in a capital-murder case.

At the beginning of Mace's individual voir dire, the trial court explained that capital murder was the only offense in Texas for which a person could receive the death penalty. Mace stated that he had not known that the death penalty was not a possible punishment for murder.

When the prosecutor questioned Mace, she explained the difference between murder and capital murder and reiterated that death was a punishment option only for capital murder. She also explained that, if appellant were found guilty of capital murder, the jury would not be asked "to vote, does he deserve [the death penalty] or does he not deserve it." The prosecutor explained that the jury would instead be asked to answer the two special issues.

Regarding the future-dangerousness special issue, the prosecutor emphasized that the answer could not automatically be "yes" just because the jury had found the defendant guilty of an intentional murder in the course of committing another felony. Mace signaled his understanding and stated, "[Y]ou've got to listen to everything that went down . . . ." When the prosecutor followed up with, "And if the State of Texas does not prove that with the evidence, the answer is no," Mace responded, "Correct."

The prosecutor explained that the jury would consider the mitigation special issue only if it answered "yes" to the future-dangerousness special issue. She emphasized that the jury could not automatically answer "no" to the mitigation special issue because it had found that the defendant was guilty of capital murder and posed a future danger. When

Mace indicated that he understood, the prosecutor asked him whether he thought that the mitigation special issue was important. This exchange followed:

[Mace:] Oh, yes.

[Prosecutor:] Why?

[Mace:] Well, it – it takes it one step further from Issue Number 1, and now – now we've got to decide – even though he may be a threat to society, what were the mitigating circumstances that led up to that murder.

[Prosecutor:] Uh-huh. And – and there may be mitigating circumstances. They have to be sufficiently mitigating, right?

[Mace:] Correct.

[Prosecutor:] Because you can imagine, it's going to have to be something pretty darn mitigating for you to say, despite the fact that I think he's going to be a continuing threat, I'm sending him anyway, right?

[Mace:] Right.

[Prosecutor:] But if you heard something that you felt was sufficiently mitigating in the – in the background or in the circumstances of the offense or character of the defendant, could you answer that yes, knowing you'd be sentencing the person to a life sentence?

[Mace:] I could.

[Prosecutor:] Even knowing that it's a guilty capital murderer who is a continuing threat?

[Mace:] Yes.

When questioning Mace, defense counsel noted his written response to a questionnaire item asking whether genetics, circumstances of birth, upbringing, and environment should be considered when determining the proper punishment for someone

convicted of a crime. Mace had written, "B.S.! I'm not concerned about how they were raised. Only that a horrible crime was committed." Defense counsel asked whether "the B.S" represented the way Mace felt, prompting the following exchange.

> [Mace:] To bring it in as – yes, in a sense. The – the act itself was that individual's – at that moment, what transpired growing up and – and such, probably got him to that point or got her to that point or helped get to that point, but that didn't – that doesn't come into play when it's the act itself.
>
> [Defense counsel:] Okay. And does it come into play when you're considering punishment?
>
> [Mace:] It may, depending on Special Issue Number 2 and the mitigation circumstances. I don't know. You know, if certain circumstances say that – I'd have to – I'd have to hear it. I don't know. You know, I mean, I would be open to listening to it, and I definitely wouldn't be qualified to say that, well, background and generics – genetics have a lot of pull on this. I wouldn't know that. I would expect you all to tell me what is going on here.

When defense counsel subsequently asked Mace whether he "could ever be convinced that there was mitigating evidence that would justify a life sentence," Mace answered, "I would say yes . . . ."

At the end of Mace's individual voir dire, defense counsel challenged him on the grounds that he would presume that the answer to the future-dangerousness special issue was yes and that he was "mitigation impaired." The trial court denied the challenge.

The record supports the trial court's ruling, and we find no abuse of discretion. To the extent Mace gave vacillating, ambiguous, or unclear responses, the trial court's decision is entitled to special deference. *Gardner*, 306 S.W.3d at 295; *Moore*, 999

S.W.2d 385 at 400, 407.  Point of error twenty-four is overruled.

Gromacki

Defense counsel challenged Gromacki, arguing that "[s]he truly cannot give the Defendant the presumption that life without parole is the proper punishment.  She said repeatedly she leaned toward the death penalty."  The defense also argued that Gromacki "would consider it if the Defendant failed to testify during the penalty phase in consideration of Special Issue Number 2."

During Gromacki's individual voir dire, the prosecutor explained that the answer to the future-dangerousness special issue was presumptively "no" because the burden was on the State to prove that the answer was "yes."  Gromacki indicated that she understood the presumption and had no questions or concerns about it.  The prosecutor's questioning continued:

> [Prosecutor:]  Okay.  So you're not one that thinks that just because somebody is convicted of capital murder means that the automatic answer to one is yes, they're always going to be a threat?
>
> [Gromacki:]  No.

Later, the prosecutor returned to the subject:

> [Prosecutor:]  Do you believe that you could require the State and would require the State to prove that a person is a future danger before answering that yes?
>
> [Gromacki:]  Yes.
>
> [Prosecutor:]  And not just say, I don't need to hear anything about future danger.  These facts were bad enough.  I don't care if he's not going to be a

future danger, I'm still going to vote yes and no. You wouldn't do that?

[Gromacki:] No.

Regarding the mitigation special issue, the prosecutor emphasized that a defendant was never required to testify and that the jury could not expect him to testify. Gromacki indicated that she understood and could follow the law concerning a defendant's right not to testify.

Defense counsel asked Gromacki if she would "lean heavily toward the death penalty" if she had found a defendant guilty of capital murder. This exchange followed:

[Gromacki:] Well, I'm trying to think. I mean, yes.

[Defense Counsel:] Fair enough. And if I was put – I'm not trying to put words in your mouth. I'm just trying to get out how you feel about this particular area of law.

[Gromacki:] My answer for that, though, would not be like a hundred percent –

[Defense counsel:] Okay.

[Gromacki:] – going in that direction. I mean –

[Defense counsel:] And that's why I use the word[s] "lean heavily." I didn't say automatically or anything. But would you lean – lean toward it – lean heavily toward it?

[Gromacki:] Yes.

Gromacki gave substantially the same answer when defense counsel later returned to the subject. Defense counsel asked whether Gromacki was "telling us that [she] could not follow the presumption that life without parole would be the appropriate punishment

because [she] lean[ed] toward the death penalty in that case[.]" Gromacki answered, "No," and explained that, while she had "no problem supporting the death penalty," she would follow the presumption that life without parole was the appropriate sentence. Gromacki denied that she would "just be going through the motions."

Defense counsel also asked Gromacki whether she would have to hear from appellant in order to answer "yes" to the mitigation special issue. The following exchange ensued:

[Gromacki:] Not – not necessarily, no.

[Defese counsel:] Well, there are people that come in and say, you know what, I could never find something sufficiently mitigating unless – without hearing from him, without hearing if he was sorry or how he felt about it. Do you know what I mean?

[Gromacki:] Uh-huh, yes.

[Defense counsel:] How do you feel about that?

[Gromacki:] I could see that playing a part in the mitigating circumstances.

[Defense counsel:] So it is something that you would consider?

[Gromacki:] Yes.

[Defense counsel:] If the Defendant didn't testify in the penalty phase with regard to Special Issue Number 2, that is something you would take into consideration?

[Gromacki:] Yes.

[Defense counsel:] Despite the fact that the law says he doesn't have to testify?

[Gromacki:] Yes.

At the end of defense counsel's questioning, the trial court explained to Gromacki that appellant had a right not to testify and asked whether she could follow the law. Gromacki stated that she could. The trial judge then asked Gromacki whether, understanding the law, she would require appellant to testify concerning the mitigation special issue. Gromacki answered that she would not.

We find no abuse of discretion. We give particular deference to the trial court's ruling where, as here, a potential juror vacillates or gives contradictory answers. *See Gardner*, 306 S.W.3d at 295; *Moore*, 999 S.W.2d 385 at 400, 407. The trial judge was entitled to believe Gromacki, and we defer to his credibility determination. *See Gonzalez*, 353 S.W.3d at 836 n.7. Point of error twenty-five is overruled.

## Wagler and Adams

Because appellant received two additional peremptory strikes, he cannot demonstrate harm unless he shows that the trial court erroneously denied at least three of his challenges for cause to the eight venire members at issue in points of error twenty through twenty-seven. *See Chambers*, 866 S.W.2d at 23. We have reviewed appellant's challenges for cause to six of those potential jurors and found no error by the trial court. Accordingly, even if we assume that the trial court erred in denying appellant's challenges for cause to the two remaining venire members at issue, Wagler and Adams, appellant cannot show harm. *See id.* Points of error twenty-six and twenty-seven are overruled.

## VOIR DIRE—REMAINING ALLEGATIONS

In points of error thirty-one and thirty-two, appellant argues that, by overruling his "objections to the trial court's actions in reference to each juror complained about previously," the trial court deprived him of a lawfully constituted jury, in violation of his due process rights under the federal and state constitutions and Article 35.16. However, appellant has failed to show that the trial court erred in its rulings concerning the complained-of venire members or that he suffered harm as a result. *See Gray v. State*, 233 S.W.3d 295, 301 (Tex. Crim. App. 2007).

In the absence of such a showing, we presume that the jurors who served on appellant's jury were qualified. *See id.* Because appellant has not overcome this presumption, he is not entitled to relief. *See id.* at 301–02. Points of error thirty-one and thirty-two are overruled.

### ADMISSION OF PHOTOGRAPHS AND VIDEOTAPE EVIDENCE

In points of error thirty-four through thirty-seven, appellant argues that the trial court erred at the guilt-innocence phase by admitting a videotape and various photographs into evidence. Appellant contends that the evidence violated Texas Rule of Evidence 403.[12]

We review a trial court's decision to admit or exclude evidence, including photographs and silent videotape, for an abuse of discretion. *See Young v. State*, 283

---

[12] Unless otherwise stated, all future references to "Rules" refer to the Texas Rules of Evidence.

S.W.3d 854, 875 (Tex. Crim. App. 2009); *Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006); *Alvarado v. State*, 912 S.W.2d 199, 213 (Tex. Crim. App. 1995). The trial court's decision may be disturbed on appeal only when it falls outside the zone of reasonable disagreement. *See Young*, 283 S.W.3d at 875; *Alvarado*, 912 S.W.2d at 213.

Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Davis*, 329 S.W.3d at 806.

A photograph is generally admissible if verbal testimony about the matters depicted in the photograph is also admissible. *See Young*, 283 S.W.3d at 875. Rule 403 requires that a photograph possess some probative value and that its inflammatory nature not substantially outweigh that value. *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009).

A court may consider several factors in determining whether the danger of unfair prejudice substantially outweighs the probative value of photographs, including the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black and white, whether they are close-up, and whether the body depicted is clothed or naked. *See Young*, 283 S.W.3d at 875. But a court should not be limited by

this list. *Id*. It should also consider the availability of other means of proof and the circumstances unique to each individual case. *Id*. Where elements of a photograph are genuinely helpful to the jury in making its decision, and the photograph's power "emanates from nothing more than what the defendant himself has done[,] we cannot hold that the trial court has abused its discretion merely because it admitted the evidence." *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995); *see Prible v. State*, 175 S.W.3d 724, 734 n.20 (Tex. Crim. App. 2005). A trial court's analysis of the admissibility of a silent videotape under Rule 403 is the same as it is for still photographs. *See Alvarado*, 912 S.W.2d at 213.

### *Surveillance Camera Videotape and Still Photos of the Offense*

In point of error thirty-five, appellant challenges the trial court's decision to admit State's Exhibit 17, a silent, black-and-white videotape of the offense compiled from footage captured by the Whip-In's surveillance video cameras. The trial court did not abuse its discretion.

The videotape depicts appellant entering the store with a lighter and a bottle of lighter fluid, going behind the counter, pouring the lighter fluid on Harris, and taking property. It then shows something bursting into flames, and Harris, on fire, frantically trying to extinguish herself while appellant calmly left the store. Thus, the video was highly relevant to the elements on which the State bore the burden of proof, including appellant's intent. Although the events captured by the surveillance videotape are

disturbing, the videotape shows no more than how the offense transpired. *See Williams*, 301 S.W.3d at 691; *Prible*, 175 S.W.3d at 734 n.20; *Sonnier*, 913 S.W.2d at 519. Point of error thirty-five is overruled.

In point of error thirty-four, appellant asserts that the trial court erred in admitting twenty-four black-and-white still photographs from the surveillance video. Appellant asserts that the photographs, marked State's Exhibits 79–102, were unnecessary because he did not dispute Harris's identity, the fact of her death, or how she died, and the jury had already seen the videotape. He contends that the photographs marked as State's Exhibits 99 and 100 were exceptionally prejudicial because they showed Harris on fire.

The trial court did not abuse its discretion by admitting the photographs. This Court has held that "a still photograph is not cumulative of a videotape." *Matamoros v. State*, 901 S.W.2d 470, 476 (Tex. Crim. App. 1995) (explaining that, although a videotape and a photograph may depict the same subject matter, they each give the jury a unique perspective). The photographs at issue showed key events captured in the video and allowed the jury to examine the scene in detail. *See id.* And like the videotape, the still photographs were not unfairly prejudicial. *See Williams*, 301 S.W.3d at 691. Point of error thirty-four is overruled.

*Photographs of Harris's Injuries*

In point of error thirty-six, appellant argues that the trial court erred in admitting nine autopsy photographs of Harris's injuries into evidence. In point of error thirty-seven,

appellant argues that the trial court erred by admitting seven photographs of her injuries taken while she was being treated. In both points of error, appellant contends that the photographs were unfairly prejudicial under Rule 403.

The record shows that the State had seventy-four photographs of Harris's injuries, twenty-nine of which were taken at the hospital while she was being treated and forty-five of which were taken during her autopsy. In anticipation of testimony that it would present through Dr. Hunt and Dr. Dyer, the State presented all of the photographs to the trial court for review, then moved to admit nine of the hospital photographs (marked as State's Exhibits 9 and 151 through 158) and seven of the autopsy photographs (marked as State's Exhibits 144 through 150).

In offering the exhibits, the prosecutor acknowledged that the photographs were gruesome but asserted that there was no other way to show the jury the injuries that Harris suffered as a result of the offense. The prosecutor stated that she enlisted the assistance of both witnesses to select only those photographs that were necessary to show Harris's injuries and had taken care to show the injuries without repetition and in the least gruesome way.

After reviewing all seventy-four photographs, the trial court admitted the exhibits at issue over defense counsel's objection that the photographs had "very little" probative value and their prejudicial effect was "extreme." The trial court stated that, based on the trial testimony up to that point, Harris suffered ten different documented injuries, and the

State was offering a total of sixteen photographs to show them. It found that "some of them are . . . repetitious only in that the photographs taken at the hospital were also taken by the [medical examiner]." It further found that "the probative value [was] not outweighed by the prejudicial effects."

The State used the hospital photographs during Dr. Hunt's testimony to help him explain Harris's injuries to the jury. The State used the autopsy photographs during Dr. Dyer's testimony to help her explain the slippage and necrosis of Harris's skin, as well as other details of Harris's injuries. The record shows that all of the photographs at issue were published to the jury in color on three screens, the largest of which was approximately 3' x 5' in size. The original 8½" x 14" color photographs marked as State's Exhibits 144 through 158 are included with the appellate record. State's Exhibit 9 is represented in the appellate record as a black-and-white photocopy of the original photograph.

After reviewing the photographs, we conclude that the trial court's ruling was within the zone of reasonable disagreement. The location and severity of Harris's injuries were probative of appellant's intent to kill her. *See Rojas v. State*, 986 S.W.2d 241, 249–50 (Tex. Crim. App. 1998); *see also Prible*, 175 S.W.3d at 733. The photographs reflected injuries that appellant inflicted, and helped Drs. Hunt and Dyer explain the injuries accurately to the jury. *See Williams*, 301 S.W.3d at 691. A trial court does not abuse its discretion in admitting autopsy photographs over a Rule 403 objection if the

photographs help to explain the medical examiner's testimony describing the victim's various wounds for which a defendant is responsible. *See Escamilla v. State*, 143 S.W.3d 814, 826 (Tex. Crim. App. 2004); *see also Prible*, 175 S.W.3d at 733. The trial court was within its discretion to determine that the photographs were genuinely helpful to the jury in making its decision, and that the photographs' power "emanate[d] from nothing more than what the defendant himself ha[d] done." *See Sonnier*, 913 S.W.2d at 519; *Prible*, 175 S.W.3d at 734 n.20. Points of error thirty-six and thirty-seven are overruled.

## HEARSAY TESTIMONY

Appellant argues points of error thirty-eight through forty together, asserting that each point involves similar facts and the same issues of law. In point of error thirty-eight, appellant argues that the trial court erred by overruling his hearsay objection to Officer Billy Coffey's guilt-innocence phase testimony. In point of error thirty-nine, appellant contends that the trial court erred by overruling his hearsay and Confrontation Clause objections to Officer Larry Wilson's guilt-innocence phase testimony concerning statements that Harris made to him at the hospital. In point of error forty, appellant argues that the trial court erred at the punishment phase by overruling his objections to an in-car police video containing Harris's statements as "(1) improper rebuttal, (2) hearsay, (3) violation of [the] right of confrontation[,] and[] (4) relevance."

The record shows that the prosecutor asked Coffey about Harris's emotional state when he first encountered her. Coffey responded that Harris was screaming for help.

Coffey testified that he immediately sprayed Harris with a fire extinguisher, and thereafter entered the Whip In, where he extinguished some burning clothing. He stated that Harris was still screaming when he came out of the store. The prosecutor then asked Coffey whether Harris was able to give Officer Simon (the officer who was with Coffey) "a description of the person who had done this to her[.]" Coffey answered, "Yes. She said a black male came into the store – ," but was cut off by defense counsel, who stated that she was "going to object to hearsay and confrontation."

The prosecutor responded that Harris's statement was an "excited utterance" and "not testimonial." Defense counsel offered no counter-argument, and the trial court overruled both objections. The prosecutor continued questioning Coffey, asking, "What did she tell y'all?" Without further objection from defense counsel, Coffey answered that Harris "told Officer Simon and then he repeated it to me, that – she said there was a black male that came into the store and he robbed her and poured something on her." The prosecutor asked Coffey again whether Harris "was able to give a description of the black male[.]" Coffey responded, "Not to me."

Appellant failed to preserve error concerning Coffey's objected-to testimony. *See* TEX. R. APP. P. 33.1. A complaint is not preserved for appeal unless it was made to the trial court by a timely request, objection, or motion that stated the grounds for the ruling that the complaining party sought with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context. *Resendez v.*

*State*, 306 S.W.3d 308, 312 (Tex. Crim. App. 2009) (discussing Texas Rule of Appellate Procedure 33.1). "Although there are no technical considerations or forms of words required to preserve an error for appeal, a party must be specific enough so as to let the trial judge know what he wants, why he thinks himself entitled to it, and do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." *Id*. at 312–13 (internal quotation marks omitted). We have emphasized that "[t]he parties, not the judge, are responsible for the correct application of evidentiary rules" and that "to preserve a complaint for appeal, the complaining party must have done everything necessary to bring the relevant evidentiary rule and its precise and proper application to the trial court's attention." *See id.* at 313.

At trial, defense counsel lodged two generalized objections, stating only "hearsay" and "confrontation." The prosecutor responded to the hearsay objection by asserting that the complained-of statement met the excited-utterance exception to the prohibition against hearsay. *See* TEX. R. EVID. 803(2). Defense counsel then stood silent, neither arguing that the statement failed to meet the  excited-utterance exception nor asserting that her hearsay objection had another basis. On this record, appellant failed to preserve any error for appellate review. *See Resendez*, 306 S.W.3d at 312–13.

Further, even if appellant had preserved point of error thirty-eight for appellate review, his briefing is inadequate. *See* TEX. R. APP. P. 38.1. In the limited briefing he provides for points of error thirty-eight through forty, appellant quotes from Rule

804(b)(2), which concerns the dying-declaration exception to the prohibition against hearsay. Appellant, however, does not apply the law to the facts of the case. Instead, he simply "submits that the evidence does not show the victim's sense of imminent death as required by Rule 804(b)(2) . . . to be an exception to the hearsay rule" and "argues that the trial court abused its discretion in admitting the complained of evidence in each issue." He lastly asserts that "the error is not harmless as it denied [a]ppellant an opportunity to confront the witness, a constitutional issue[,] and its prejudicial effect was not outweighed by its probative value as to each complained of evidence proffered in each issue." *See* TEX. R. APP. P. 38.1; *see also Linney v. State*, 413 S.W.3d 766, 767–68 (Tex. Crim. App. 2013) (Cochran, J., concurring) (stating that where the appellant "merely made a conclusory argument that recited the elements of his stated grounds for relief," it fell "far short of satisfying his obligation to adequately discuss his . . . claim"); *Ex parte Parra*, 420 S.W.3d 821, 828 (Tex. Crim. App. 2013) (finding that, where a writ applicant did "nothing more than state that '[he] demonstrates that he has suffered prejudice,'" his conclusory assertion did not show that he was entitled to relief).

In short, like trial counsel, appellant does not explain why the complained-of statement failed to meet the excited-utterance exception to the hearsay rule, and he does not assert any other hearsay-related basis for the statement's exclusion. Point of error thirty-eight is overruled.

Appellant bases point of error thirty-nine on two separate legal theories and point

of error forty on four separate legal theories, which renders both points of error

multifarious. *See Davis*, 329 S.W.3d at 803. In addition, his briefing is inadequate

because he does not apply the law to the facts and relies solely on conclusory allegations.

*See* TEX. R. APP. P. 38.1; *see also Linney*, 413 S.W.3d at 767–68 (Cochran, J.,

concurring); *Parra*, 420 S.W.3d at 828. Points of error thirty-nine and forty are

overruled.

### EXTRANEOUS-ACTS EVIDENCE–GUILT-INNOCENCE

In point of error forty-one, appellant alleges that the trial court erred during the

guilt-innocence phase under Rule 404(b) by admitting evidence of his bad acts and

offenses after fleeing the Whip-In.[13] Outside of the jury's presence, the prosecutor

advised the trial court that Jim Medley and Ken Marecle, residents of the neighborhood in

which police apprehended appellant, would testify about their encounters with appellant.

The prosecutor stated that Medley and Marecle encountered appellant no more

than two hours after the offense. She asserted that their testimony was evidence of

appellant's contemporaneous conduct, rather than extraneous offense evidence. She

argued that their testimony showed appellant's flight from the crime and was probative of

---

[13] Rule 404(b) states, in relevant part:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may however be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

his intent and state of mind at the time of the offense and shortly afterward. Defense counsel countered that "the test for whether or not something is extraneous or same transaction is whether it's necessary to the jury's understanding of the charged offense." Defense counsel asserted that Medley's and Marecle's testimony was not necessary to the jury's understanding. The trial court overruled the objection.

The trial court did not abuse its discretion. It was within the zone of reasonable disagreement to determine that Medley's and Marecle's testimony constituted same-transaction contextual evidence or that it was admissible as evidence of flight. *See Devoe*, 354 S.W.3d at 470 ("'[F]light is admissible as a circumstance from which an inference of guilt may be drawn.'"); *Prible*, 175 S.W.3d at 731–32 ("Same-transaction contextual evidence results when an extraneous matter is so intertwined with the State's proof of the charged crime that avoiding reference to it would make the State's case incomplete or difficult to understand."); *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Attempts to conceal incriminating evidence . . . are probative of wrongful conduct and are also circumstances of guilt."). Point of error forty-one is overruled.

VOLUNTARY-INTOXICATION INSTRUCTION

In point of error forty-two, appellant argues that the trial court erred in overruling his objection to the jury charge regarding voluntary intoxication. At the charge conference during the guilt-innocence phase, appellant objected to the inclusion of a voluntary intoxication instruction pursuant to Texas Penal Code § 8.04(a), on the grounds

that the instruction would violate his "Fifth, Sixth, Eighth, and Fourteenth Amendment rights to present a defense." On appeal, appellant argues only that "the intoxication instruction is not required where defense of insanity as a defense [sic] is not raised as in the case at bar" and that he "was reversibly harmed by this instruction in guilt/innocence." Appellant failed to preserve the claim that he raises on appeal because it does not comport with his objection at trial. *See* TEX. R. APP. P. 33.1; *Lucio v. State*, 351 S.W.3d 878, 900 (Tex. Crim. App. 2011). In addition, appellant's briefing is inadequate. *See* TEX. R. APP. P. 38.1; *see also Linney*, 413 S.W.3d at 767–68 (Cochran, J., concurring); *Parra*, 420 S.W.3d at 828. Point of error forty-two is overruled.

### EXTRANEOUS-ACTS EVIDENCE–PUNISHMENT PHASE

Thirty days before trial, the State notified appellant that it intended to introduce evidence of extraneous offenses and bad acts. During the punishment phase, over appellant's objections, the State introduced evidence of four alleged assaults by appellant against his former girlfriend, Amy Franks, in 1993.[14] Franks also testified that, during the same period, appellant habitually abused alcohol and marijuana and verbally threatened her. In point of error forty-three, appellant alleges that the evidence was too remote to be relevant on the issue of his deathworthiness. In point of error forty-four, appellant argues that the State's notice was inadequate under Article 37.07, § 3(g), because it provided only the year in which the alleged drug use and verbal threats occurred, rather than the

---

[14] Franks's surname was Armstrong when she dated appellant. For consistency, we refer to the witness by her married name at the time of appellant's capital murder trial.

exact date.

The trial court did not abuse its discretion by overruling appellant's relevancy objection. We have specifically declined to fashion a "per se" rule that an extraneous transaction is too remote in time to be introduced into evidence at trial. *See Templin v. State*, 711 S.W.2d 30, 34 (Tex. Crim. App. 1986). Further, "[p]rior adjudicated criminal acts, prior unadjudicated acts of violence against people and property, and habitual drug abuse have all been held by this Court to constitute evidence of future dangerousness." *Wilkerson v. State*, 881 S.W.2d 321, 326 (Tex. Crim. App. 1994). Point of error forty-three is overruled.

The State's notice of intent is reasonable only if the notice includes the "date" on which and the county in which the alleged crime or bad act occurred and the name of the alleged victim of the crime or bad act. *See* TEX. CRIM. PROC. CODE arts. 37.07, § 3(g) & 37.071, § 2(a)(1). Assuming that the State's notice was deficient under Article 37.07, section 3(g), and that the trial court therefore erred by admitting it, we must consider whether the error had a substantial and injurious effect in determining the jury's verdict. *See* TEX. R. APP. P. 44.2(b); *cf. Hernandez v. State*, 176 S.W.3d 821, 823–25 (Tex. Crim. App. 2005) (citing *Roethel v. State*, 80 S.W.3d 276, 281–82 (Tex. App.—Austin 2002, no pet.), with approval). Specifically, we consider whether the deficiency in the State's notice surprised the defense. *Cf. Hernandez*, 176 S.W.3d at 825.

Appellant does not allege that he was surprised by Franks's testimony. And

although it did not provide the day and month of the alleged drug use and verbal threats, the State's notice included substantial details about the substance of Franks's anticipated testimony:

> During the defendant's relationship with Amy [Franks], in or about the year 1993, the defendant was physically abusive. The defendant was jealous and would get violent if he thought she was with someone else. She said he punched her, pushed her, and choked her. He drank alcohol a lot and smoked marijuana. He threatened Ms. [Franks], saying, "Nobody's gonna have you if I can't have you." These incidents all occurred in Dallas County, Texas.

Considering the totality of the circumstances, appellant was given sufficient notice to prepare an appropriate defense. Accordingly, the admission of the complained of evidence did not affect appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b). Point of error forty-four is overruled.

In points of error forty-five through forty-eight, appellant alleges that the trial court erred in overruling his objections to: State's Exhibit 166, a judgment and sentence convicting him of violation of a protective order; State's Exhibit 169, a certified copy of his prior conviction for a 1995 "aggravated assault, deadly weapon"; State's Exhibit 170, a certified copy of his judgment and sentence for the offense of evading arrest; and State's Exhibit 171, a penitentiary packet that included judgments and sentences for robbery and a second evading arrest offense. He contends that the offenses were not sufficiently tied to him.

Appellant argues points of error forty-five through forty-eight together. He recites

trial counsel's objections and states the law, then conclusorily asserts that, "[t]herefore, the Trial Court erred in admitting such evidence and [a]ppellant submits that the error had a substantial or injurious effect of [sic] influence in determining the jury's verdict in the punishment stage of trial." Appellant's briefing is inadequate. *See* TEX. R. APP. P. 38.1; *see also Linney*, 413 S.W.3d at 767–68 (Cochran, J., concurring); *Parra*, 420 S.W.3d at 828. Points of error forty-five through forty-eight are overruled.

TESTIMONY OF WARDEN NELSON

In point of error forty-nine, appellant argues that the trial court erred at the punishment phase by overruling his objection to the testimony of Warden Melodye Nelson "concerning violence and weapons and . . . things done by other inmates." He contends that Nelson's testimony violated his right to individualized sentencing because her testimony concerned the conduct of individuals other than appellant himself.

Appellant's argument has no merit. The record shows that Nelson acknowledged that she had no particularized knowledge of appellant, and the State did not suggest otherwise. Nelson testified about prison staffing, the general ratio of correctional officers to inmates, the prison system's custodial-classification system, and the potential for violence within the prison system. Although she showed the jury various inmate-made weapons discovered by prison staff, Nelson did not suggest that appellant was responsible for making any of the weapons or that he participated in any violent incidents. *Cf. Ex parte Lane*, 303 S.W.3d 702, 712 (Tex. Crim. App. 2009) (criticizing the prosecution for

attempting to persuade the jury to convict the applicant based on an uncharged offense for which he was not on trial). Because Nelson's testimony did not deny appellant an individualized sentencing determination as guaranteed by the Eighth Amendment, the trial court did not abuse its discretion in overruling his objection. Point of error forty-nine is overruled.

## PUNISHMENT CHARGE

In points of error fifty-one through fifty-three, appellant asserts approximately seventy-six challenges to the trial court's punishment charge. He acknowledges that our precedents foreclose relief concerning his requested instructions and objections to the trial court's punishment charge, but states that he seeks to preserve the issues for potential federal review. He also asks us to reconsider our precedents, but provides no argument for doing so.

The points of error are multifarious, as well as inadequately briefed. *See Davis*, 329 S.W.3d at 803; TEX. R. APP. P. 38.1; *see also Linney*, 413 S.W.3d at 767–68 (Cochran, J., concurring); *Parra*, 420 S.W.3d at 828. Points of error fifty-one through fifty-three are overruled.

## CONSTITUTIONAL CHALLENGES TO ARTICLE 37.071

In points of error fifty-four through sixty-four, appellant raises various federal and state constitutional challenges to Article 37.071. Citing *Saldano v. State*, 232 S.W.3d 77 (Tex. Crim. App. 2007), appellant acknowledges that we have previously considered and

rejected each of the arguments that he raises. He explains that he submits the points of error to preserve them for federal review and to invite us to review our prior decisions.

Appellant is correct that we have previously rejected the arguments he asserts in points of error fifty-four through sixty-five. *See, e.g.*, *Coble*, 330 S.W.3d at 296–97; *Williams*, 301 S.W.3d at 694; *Saldano*, 232 S.W.3d at 107–08; *Roberts v. State*, 220 S.W.3d 521, 535 (Tex. Crim. App. 2007). Appellant does not persuade us to revisit these issues. Points of error fifty-four through sixty-five are overruled.

We affirm the judgment of the trial court.

Hervey, J.

Delivered: November 18, 2015

Do not publish